Vincent P. Hurley #111215
Amanda Cohen #243946
Ryan M. Thompson #292281
LAW OFFICES OF VINCENT P. HURLEY
A Professional Corporation
28 Seascape Village
Aptos, California 95003
Telephone: (831) 661-4800
Facsimile: (831) 661-4804

Attorneys for Plaintiff/Counter-Defendant
MARBLE BRIDGE FUNDING GROUP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARBLE BRIDGE FUNDING GROUP, INC.,<br>Plaintiff,<br>vs.<br>EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY,<br>Defendant. | Case No. CV12-02729-EJD<br>Related to Case Nos. CV12-01839-EJD and CV15-00177-EJD<br>PLAINTIFF/COUNTER-DEFENDANT MARBLE BRIDGE FUNDING GROUP, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT AND OBJECTIONS TO EULER'S EVIDENCE |
| AND RELATED COUNTERCLAIMS | Date: July 2, 2015<br>Time: 9:00 a.m.<br>Courtroom 4, Fifth Floor<br>Hon. District Court Judge Edward J. Davila |

**TABLE OF CONTENTS**


I. INTRODUCTION ........................................................ 1

II. ARGUMENT ........................................................ 2

A. Summary Judgment Standard ........................................................ 2

B. There Exist Material Disputes of Fact as to Each of Marble Bridge's Fraud-Based Claims, Specifically Aiding and Abetting Fraud (First Claim); Fraud and Deceit-Intentional Misrepresentation (Second Claim), Fraud and Deceit-Fraudulent Concealment (Third Claim); and Negligent Misrepresentation (Fourth Claim), and therefore, Euler's Motion for Summary Judgment As to Those Claims Should Be Denied ........................ 3

1. Aiding and Abetting Fraud (First Claim)
Prior to Marble Bridge Filing Its Claims, Euler had Actual Knowledge of the Nature's Own Fraud, and Substantially Assisted in the Fraud by Concealing such Knowledge from Marble Bridge and, alternatively, Maintaining and Granting Credit Limits on the Fraudulent Nature's Own Buyers ........................................................ 3

2. Fraud and Deceit-Intentional Misrepresentation (Second Claim); Fraud and Deceit-Fraudulent Concealment (Third Claim)
Euler Intentionally Misrepresented and Fraudulently Concealed from Marble Bridge Information, Known Exclusively to Euler, Regarding the Nature's Own Fraud and, Alternatively, Euler was under a Duty to Disclose such Information, yet Failed to do so ........................ 11

3. Negligent Misrepresentation (Fourth Claim) ........................ 13

a. Euler's Maintenance and Granting of Credit Limits for Buyers under the Euler-Nature's Own Policy was a "Positive Assertion," triggering liability for Negligent Misrepresentation ........................ 14

b. Euler knew or should have known that the companies they represented to be credit worthy were in fact not, and it was unreasonable for Euler to represent them as credit worthy. ........................ 17

C. There Exist Material Disputes of Fact as to Each of Marble Bridge's Contract-Based Claims, Specifically Declaratory Relief (Fifth Claim), and Breach of Contract (Sixth Claim), and, therefore, Euler's Motion for Summary Judgment As to Those Claims Should Be Denied ........................ 18

1. The Initial Policy, issued by Euler to Nature's Own on November 1, 2010, and the Renewed Policy, Renewed November 1, 2011, are Separate and Distinct Policies ........................ 18

2. Euler Breached Policy One and Policy Two, respectively; Marble Bridge is entitled to Coverage under Each Policy; and, Euler is Equitably ........................ 19

a. Euler Breached the Express Terms of Policy Two by Canceling Credit Limits for Buyers on each Policy without providing Written Notice to Marble Bridge. ..... 19

b. Marble Bridge is entitled to Coverage under the Policy ..... 20

c. Due to Euler's Knowledge of and Concealment of the Fraud Regarding Nature's Own, Euler is Equitably Estopped from Denying Marble Bridge Coverage under the Policy ..... 22

D. There Exist Material Disputes of Fact as to Marble Bridge's Seventh Claim for Relief, Breach of the Implied Covenant of Good Faith and Fair Dealing, and, therefore, Euler's Motion for Summary Judgment Should Be Denied ..... 25

E. There Exist Material Disputes of Fact as to Marble Bridge's Eighth Claim for Relief, Unfair Competition under California Business and Professions Code Section 17200, and therefore, Euler's Motion for Summary Judgment Should Be Denied ..... 27

a. There remain Questions of Fact as to whether Funds sent by Nature's Own, and received from Euler, included misappropriated money lent by Marble Bridge ..... 28

b. There is no adequate remedy at law. ..... 28

c. Euler's violation of California Business and Professions Code section 17500 regarding false or misleading statements triggers liability under California Business and Professions Code section 17200. ..... 29

d. Euler does not Address Marble Bridge's Allegations Regarding Wrongful Conduct ..... 32

F. Marble Bridge's Claims Under RICO Are Properly Before the Court, as Courts Prefer to Decide Cases Based on Their Merits, and Euler's Resulting Prejudice Is Minimal. ..... 32

III. OBJECTIONS TO EVIDENCE ..... 35

IV. CONCLUSION ..... 37

## TABLE OF AUTHORITIES


I. STATE STATUTES:

Bus. & Prof. Code 17500 .......... 29
Bus. & Prof. Code section 17200 .......... 27
Civ. Civ. Code section 1710(2) ..........
Cal. Civ. Code section 1636 .......... 20
Cal. Civ. Code section 1644 .......... 20

II. FEDERAL RULES:

Fed. R. Civ. P. 56(c) .......... 3

III. FEDERAL CASES:

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248 (1986) .......... 3

*Anschutz Corp. v. Merrill Lynch and Co. Inc.*
785 F. Supp. 2d 799, 825, 827(N.D. Cal. 2011) .......... 17

*Celotex Corp. v. Catrett*
477 U.S. 317, 323 (1986) .......... 3

*Clark v. County of Tulare*
755 F. Supp. 2d 1075, 1090 (E.D.Cal. 2010) .......... 12

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*
236 F.3d 1148, 1154 (9th Cir.2001) .......... 3

*Eminence Capital, LLC v. Aspeon, Inc.*
316 F.3d 1048, 1052 (9th Cir. 2003) .......... 33

*Foman v. Davis*
371 U.S. 178, 182 (1962) .......... 32, 33

*In re First Alliance Mortg. Co.*
471 F.3d 977, 993 (9th Cir. 2006) .......... 3, 4, 5

*McAdam v. State Nat'l Ins. Co.*
No 12cv1333 BTM (MDD), 2012 U.S. Dist. LEXIS 136444
*4-5 (S.D. Cal. Sept. 24, 2012) .......... 29

*Lujan v. National Wildlife Federation*
497 U.S. 871, 894-895 (1990) .......... 12

*Morongo Band of Mission Indians v. Rose*
893 F.2d 1074, 1079 (9th Cir. 1990) .......... 33

*Parino v. BidRack, Inc.*
838 F. Supp. 2d 900, 906 (N.D.Cal. 2011) .......... 30, 31

*S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co.*
690 F.2d 1235, 1238 (9th Cir. 1980) .......... 35

*Sonoma County Ass'n of Retired Employees v. Sonoma County*

708 F.3d 1109, 1117 (9th Cir. 2013) .......................................................... 32

*Southern California Gas Co. v. City of Santa Ana*
366 F.3d 885, 889 (9th Cir. 2003) ................................................................ 3

*Zamani v. Carnes*
491 F.3d 990, 997 (9th Cir.2007) ................................................................ 12

IV. STATE CASES:

*AIU Ins. Co. v. Sup.Ct. (FMC Corp.)*
51 Cal.3d 807, 821-822 (1990) ......................................................................... 20

*Bily v. Arthur Young & Co.*
3 Cal.4th 370, 408 (1992) ........................................................................ 14, 17

*Byrum v. Brand*
219 Cal. App. 3d 926, 942 (1990) ............................................................... 14

*California Public Employees' Retirement System (CalPERS) v. Moody's Investors Service, Inc.*
226 Cal. App. 4th 643 (2014) ................................................................. 14, 15

*Casey v. U.S. Bank National Assn.*
127 Cal. App. 4th 1138 (2005) ........................................................ 3, 4, 5, 10

*Chapman v. Skype Inc.*
220 Cal. App. 4th 217, 226-227 (2013) .......................................... 27, 28, 30

*Chase v. Blue Cross of Calif.*
42 Cal. App. 4th 1142, 1157 (1996) ........................................................... 22

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*
90 Cal. App. 4th 335, 346 (2001) ............................................................... 25

*Colony Ins. Co. v. Crusader Ins. Co.*
188 Cal. App. 4th 743, 751 (2010) ............................................................ 22

*Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.*
92 Cal. App. 4th 886, 894 (2001) ......................................................... 27, 32

*Dollinger DeAnza Assocs. v. Chicago Title Ins. Co.*
199 Cal. App. 4th 1132, 1154 (2011) ......................................................... 22

*Frontier Oil Corp. v. RLI Ins. Co.*
153 Cal. App. 4th 1436, 1463 (2007) ......................................................... 21

*Gruenberg v. Aetna Ins. Co.*
9 Cal.3d 566, 573 (1973) ............................................................................ 25

*Hahn v. Mirda*
147 Cal. App. 4th 740, 748 (2007) ....................................................... 11, 12

*Hewlett v. Squaw Valley Ski Corp.*

54 Cal. App. 4th 499, 519 (1997) ..... 27

*Intrieri v. Superior Court*
117 Cal. App. 4th (2004) ..... 13

*Kleveland v. Chicago Title Ins. Co.*
141 Cal. App. 4th (2006) ..... 18, 19

*Korea Supply Co. v. Lockheed Martin Corp.*
29 Cal.4th (2003) ..... 27, 28, 30

*Lomita Land & Water Co. v. Robinson*
154 Cal. (1908) ..... 4

*Lovejoy v. AT&T Corp.*
119 Cal. App. 4th (2004) ..... 11

*Minich v. Allstate Ins. Co.*
193 Cal. App. 4th (2011) ..... 25

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*
104 Cal. App. 4th (2002) ..... 27

*Rios v. Scottsdale Ins. Co.*
119 Cal. App. 4th (2004) ..... 13

*Salvati v. Cusolito*
98 Cal. App. 2d (1950) ..... 14

*Thrifty-Tel, Inc., v. Bezenek*
46 Cal. App. 4th (1996) ..... 11

*Upasani v. State Farm General Insurance Company*
227 Cal. App. 4th 509, 519 (2014) ..... 3, 4

*Waller v. Truck Ins. Exch., Inc.*
11 Cal.4th (1995) ..... 25

*Wilner v. Sunset Life Ins. Co.*
78 Cal. App. 4th (2000) ..... 30

*Wilson v. 21st Century Ins. Co.*
42 Cal.4th (2007) ..... 25

*Wolschlager v. Fidelity Nat. Title Ins. Co.*
111 Cal. App. 4th (2003) ..... 18

# I.
# INTRODUCTION

Marble Bridge Funding Group, Inc. ("Marble Bridge") submits the instant Opposition and supporting papers in response to Euler Hermes American Credit Indemnity Company's ("Euler") Motion for Summary Judgment ("Motion"). Euler seeks summary judgment as to each of the ten separate claims set forth in Marble Bridge's First Amended Complaint, which consist of "Aiding And Abetting Fraud" (First Claim, Am. Compl. ¶¶ 104-113); "Fraud and Deceit – Intentional Misrepresentation/Civil Code Sections 1709 *et seq*., 1572, 3294" (Second Claim, Am. Compl. ¶¶ 114-123); "Fraud and Deceit – Fraudulent Concealment/Civil Code Sections 1709 *et seq*., 1572, 3294" (Third Claim, Am. Compl. ¶¶ 124-139); "Negligent Misrepresentation/Civil Code Sections 1709 *et seq*., 1573" (Fourth Claim, Am. Compl. ¶¶ 140-149); "Declaratory Relief" (Fifth Claim, Am. Compl. ¶¶ 150-153); "Breach of Contract" (Sixth Claim, Am. Compl. ¶¶ 154-171); "Breach of the Implied Covenant of Good Faith and Fair Dealing" (Seventh Claim, Am. Compl. ¶¶ 172-188); "Unfair Competition [under California Business & Professions Code section 17200]" (Eighth Claim, Am. Compl. ¶¶ 189-192); "RICO 18 U.S.C. § 1962" (Ninth Claim, Am. Compl. ¶¶ 193-203); and RICO 18 U.S.C. § 1962 (Tenth Claim, Am. Compl. ¶¶ 204-211).

Euler's arguments regarding Marble Bridge's fraud-based claims are respectively grounded in the notion that Euler did not have actual knowledge of the Nature's Own fraud. As set forth herein, Euler had extensive knowledge of the Nature's Own fraud well before Marble Bridge filed its claims, and even issued orders to its employees to refrain from disclosing such knowledge to Marble Bridge.

The foundation for Euler's Motion as to Marble Bridge's Breach of Contract, Declaratory Relief, and Implied Covenant of Good Faith and Fair Dealing claims, respectively, is that Marble Bridge, in its capacity as a beneficiary, is not afforded contractual coverage, and, alternatively, Euler did not commit any breach of contract.

First, it should be noted that Euler breached two separate and distinct policies. As will be set forth in further detail below, the initial policy and the renewal policy are separate policies,

and Euler seeks to impermissibly lump each policy as a single policy. Contrary to Marble Bridge's arguments, Euler did indeed breach the terms of each policy at issue by failing to provide Marble Bridge written notice of each and every credit limit cancellation under each Policy. Further, due to Euler's knowledge and concealment of the fraud regarding Nature's Own, Euler is equitably estopped from denying Marble Bridge coverage. Finally, Marble Bridge is covered under the express terms of each Policy.

Euler's Motion with regard to Marble Bridge's Unfair Competition claim does not address Marble Bridge's allegations regarding Euler's misconduct. Euler instead argues that Marble Bridge is not entitled to restitution as "there is no evidence that Euler received *any* funds from Marble Bridge." As set forth in greater detail, given the nature of the fraud, there remain genuine disputes of material fact as to whether money lent from Marble Bridge to Nature's Own was subsequently provided to Euler from the criminals in the form of premiums, fees, or other charges.

Finally, Euler asserts that Marble Bridge's claims under RICO "are of no force and effect" based on the Court's September 3, 2014 Order regarding Marble Bridge's Motion for Leave to File Amended Complaint. There are a variety of factors, however, as to why the RICO claims are properly before the Court, including that courts generally prefer to hear cases on the merits, the RICO claims were extensively briefed by both parties and consequently reviewed by the Court, the RICO claims are similar in nature to claims the Court expressly granted Marble Bridge leave to amend to add in its first amended complaint, and Euler will suffer relatively minimal prejudice in defending such claims.

Viewing the evidence in the light most favorable to Marble Bridge, there exist material disputes of fact as to each and every one of the claims set forth in Marble Bridge's First Amended Complaint. Accordingly, Euler's Motion for Summary Judgment should be denied.

## II.
## ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is proper if the pleadings and evidence show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party has the burden, his or her showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Southern California Gas Co. v. City of Santa Ana*, 366 F.3d 885, 889 (9th Cir. 2003).

The court views the evidence in the light most favorable to the non-moving party to determine if there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Cnty. of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001). A fact is "material" only if it might affect the outcome of the case, and a dispute is "genuine" only if a reasonable trier of fact could resolve the issue in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court draws all justifiable inferences in favor of the non-moving party. *Id.* at 255.

**B. There Exist Material Disputes of Fact as to Each of Marble Bridge's Fraud-Based Claims, Specifically Aiding and Abetting Fraud (First Claim); Fraud and Deceit-Intentional Misrepresentation (Second Claim); Fraud and Deceit-Fraudulent Concealment (Third Claim); and Negligent Misrepresentation (Fourth Claim), and therefore, Euler's Motion for Summary Judgment As to Those Claims Should Be Denied.**

**1. Aiding and Abetting Fraud (First Claim).**

Prior to Marble Bridge Filing Its Claims, Euler had Actual Knowledge of the Nature's Own Fraud, and Substantially Assisted in the Fraud by concealing such Knowledge from Marble Bridge and, alternatively, Maintaining and Granting Credit Limits on the Fraudulent Nature's Own Buyers.

"California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Upasani v. State Farm General Insurance Company*, 227 Cal.App.4th 509, 519 (2014). A finding of specific intent is not required. *In re First Alliance Mortg. Co.*, 471 F.3d

977, 993 (9th Cir. 2006). The words "aid and abet" have a well-understood meaning, and may be fairly construed to imply an intentional participation with knowledge of the object to be attained. *Casey v. U.S. Bank National Assn.*, 127 Cal.App.4th 1138 (2005) (quoting *Lomita Land & Water Co. v. Robinson*, 154 Cal. 36, 47 (1908). A defendant who acts with actual knowledge of the intentional wrong to be committed and provides substantial assistance to the primary wrongdoer is not an accidental participant in the enterprise. *Upasani*, 227 Cal.App.4th at 519.

Ordinary business transactions can satisfy the substantial assistance element of an aiding and abetting claim if the entity providing the service knew those transactions were assisting the customer in committing a specific tort. *Casey*, 127 Cal.App.4th at 1145. Knowledge is the crucial element. *Id.*

*In re First Alliance Mortg. Co*., 471 F.3d 977 (9th Cir. 2006), concerned causes of action filed in bankrupt subprime mortgage lender's (First Alliance Mortgage Company's) Chapter 11 bankruptcy case brought by borrowers (plaintiffs) who were allegedly defrauded by First Alliance. Plaintiffs alleged other lenders (Defendant Lehman) financed First Alliance's operations on an aiding and abetting fraud theory. The Court in *First Alliance* denied defendant's request for judgment as a matter of law on plaintiffs' aiding and abetting fraud theory, finding that defendant had "actual knowledge" of the alleged fraud and "substantially assisted" in the fraud. *Id.* at 993, 994.

Among other evidence in the record regarding defendant's alleged "actual knowledge," plaintiffs highlighted the facts that defendant received reports that detailed the fraudulent practices in which First Alliance was engaged, and that in one report, a Lehman officer noted his concern that if First Alliance "does not change its business practices, it will not survive scrutiny." *Id.* at 994. That same evaluation recounted that First Alliance "does not have the clear-cut defenses that the management believes" and that "at the very least, this is a violation of the spirit of the Truth in Lending Act." *Id.* The Court held that "it was not unreasonable for the

jury to rely upon these evaluations in concluding that Lehman had actual knowledge of First Alliance's fraudulent loan origination procedures." *Id.*

In determining that defendant "substantially assisted" the fraud, the Court noted that defendant "satisfied all of First Alliance's financing needs." *Id.* at 995; (see also *Casey*, 127 Cal.App.4th at 1145. The Court summarily disregarded defendant's argument that it knowingly provided only "significant assistance" to First Alliance's *business*, not substantial assistance to the *fraud*, reasoning that "[i]n a situation where a company's whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference." *In re First Alliance Mortg. Co.*, 471 F.3d at 995.

*Actual Knowledge*

Euler's Motion pertaining to Marble Bridge's Aiding and Abetting claim is premised on the notion that Euler did not have "actual knowledge" of the Nature's Own fraud. Contrary to Euler's assertion, there is substantial evidence regarding Euler's "actual knowledge" between 2010 and 2012 and active concealment of the fraud.

In April 2010, Euler learned that Marsha Kay Holloway was a convicted felon who was previously jailed for an organized fraud in which she utilized "International Air Cargo" in the fraud. See Marble Bridge's "Additional Fact W" to Euler's Separate Statement of Undisputed Material Facts, Fact 73.[1] **MBFG Additional Fact W.** International Air Cargo was a fraudulent buyer on Policy One and Policy Two one year later when MBFG was swindled with a Euler insurance policy by criminals using the same fake company – International Air Cargo. **MBFG Additional Fact X.** Despite Euler's receipt of the article regarding Holloway and International Air Cargo, Euler continued to approve credit limits for International Air Cargo. **MBFG Additional Fact Y.**

In May 2010, Euler received a $500,000.00 claim from Factor King, another financing company and beneficiary on a Euler insurance policy that had purchased invoices of a Euler-insured fake company, U.S. Hay Direct. **MBFG Additional Fact Z.** Fake buyers who had

---

[1] References to Marble Bridge's "Additional Facts" in response to Euler's Separate Statement of Undisputed Material Facts are herein referenced as "MBFG Additional Fact A, B, C"), etc.

defaulted on the Euler-U.S. Hay policy included Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle. **MBFG Additional Fact AA.** When the criminals stopped paying, Factor King submitted its claim with the invoices to Euler. **MBFG Additional Fact BB.** Factor King subsequently sued both Euler and Nature's Own, and obtained default judgments against several of the buyers, including Absolute Equestrian, Iberian Horse, Rancho Linda Marchadores and Manchester Financial Group. **MBFG Additional Fact NN.**

Despite the Factor King claim, Euler continued to insure and "do business" with Nature's Own in Nature's Own's capacity as both an insured *and* as a buyer on various policies. **MBFG Additional Fact CC.** The same buyer companies in the Factor King fraud were used in the fraud on Marble Bridge. **MBFG Additional Fact DD.**

Similar to the defendant in *First Alliance*, on June 28-29, 2010, when dealing with Holloway, Euler accounts manager Steven Redmer wrote: "*I'm bowing out of this whole mess*" and *"This smells like fraud to me, …."* **MBFG Additional Fact EE.** On July 8, 2010, after being alerted by Factor King, Euler Account Manager Janny Fleitas informed Vice President and Head of Commercial Underwriting Paul Haigley and Steven Redmer that one of the buyers listed for U.S. Hay (Rancho Linda Marchadores) did not have a physical address and no one answered the phone number listed in Euler's Dun & Bradstreet report, there were lawsuits against the buyers, and the buyers were on other Euler policies. **MBFG Additional Fact FF.** Euler knew that the buyers listed for the Euler-U.S. Hay Direct policy included, among other fake buyers, Nature's Own, and Rancho Linda Marchadores. **MBFG Additional Fact GG.** Nature's Own was subsequently the insured on both Policy One and Policy Two in which MBFG was defrauded, with Rancho Linda Marchadores again serving as a fake buyer. See **MBFG's "Disputed Facts" in Response to Euler's "Fact 10;"[2] Additional Fact YY; GG.**

On July 13, 2010, Euler's VP Haigley wrote back to Fleitas: *"If you think there is fraud involved or think the policy should not be in place because it may be 'bad business' then lets talk about ending the relationship ASAP"*, and to otherwise cancel for nonpayment if possible, or

---

[2] References to MBFG's "Disputed Facts" are herein referred to as "Marble DFs to Euler Fact X."

keep an eye on them. **MBFG Additional Fact HH.** Euler's Steven Redmer commented on the Fleitas information: *"Shady!!!"* **MBFG Additional Fact II.** Euler employees knew that factors were being defrauded using the Euler policies when the criminals would *"need to get money again from some unlucky facto*r." **MBFG Additional Fact JJ.**

On October 8, 2010, when Vice President Haigley was notified by Euler employee Fleitas about suspicious activity of U.S. Hay Direct, LLC, Polished Advertising and U.S. Equine, Haigley told Fleitas: *"Let's lapse and run away. . . ."* which meant, not renew the policy. **MBFG Additional Fact KK.**

On May 10, 2011, Euler received a claim in excess of $300,000 from Gulf Coast Business Credit ("Gulf Coast"), which had just been defrauded on a Euler policy insuring Equipack. **MBFG Additional Fact LL.** Equipack had been a frequently listed fake *buyer* on other Euler policies, including the Euler-Nature's Own policy written on November 1, 2010, and renewed in October 2011. **MBFG Additional Fact MM.** Three of the four defaulting Euler-Equipack buyers had also simultaneously defaulted on the Euler-U.S. Hay policy related to the fraud on Factor King discussed above for which Euler was sued. **MBFG Additional Fact NN.** On the US Hay and Equipack policies, Nature's Own was one of those repeat defaulting buyers, as was Rancho Linda, and Barbed Wire Cattle. **MBFG Additional Fact OO.**

In May 2011, Euler received claims under the Euler-Equipack policy, identifying Greg Winters as the contact person for Equipack (**MBFG Additional Fact PP**) and Anette Zimmerman as the contact person for Nature's Own. **MBFG Additional Fact PP.** In September 2011, Florida State Attorney General Phil Hanson called Euler Assistant General Counsel Deborah Stuehrmann and informed Stuehrmann that the Florida State Attorney General was conducting a criminal investigation related to U.S. Hay Direct, Equipack, Holloway, and Winters. **MBFG Additional Fact QQ.**

Thus, when Euler was told by law enforcement that Winters, Equipack and US Hay were the subjects of a criminal investigation, Euler knew by the claims in its system and the Florida Attorney General information that Nature's Own was connected to the previous fraud on Factor

King, and "Anette Zimmerman" was the person operating Nature's Own. **MBFG Additional Fact RR.** Euler renewed the policy in November 2011 even though it had the aforementioned information regarding the fraud and the connection between Zimmerman and Holloway. **DF to Euler Fact 10.**

The individuals and entities revealed by Hanson were known by Euler to be participants in the Factor King fraud, and Euler had already been sued by Factor King (**MBFG Additional Fact H**) and had a claim regarding the same insureds and buyers from Gulf Coast Commercial. **Additional Fact H.** Euler knew that the buyers listed for the Euler-U.S. Hay policy included Rancho Linda Marchadores, Iberian Horse, and Phantom Sport Horse, which were all also listed as Nature's Own buyers. **MBFG Additional Fact GG.** Euler knew that Equipack LLC was also a Nature's Own Buyer. **MBFG Additional Fact UU.** Winters was also the controlling name on Equipack, a Nature's Own Buyer. **MBFG Additional Fact VV.**

Despite Euler's extensive knowledge regarding the Florida fraud involving US Hay and Equipack for which Euler had already been sued by Factor King, and Euler's knowledge of the connection of Anette Zimmerman to Nature's Own, Equipack and Greg Winters, and Euler's knowledge from the information provided by the Florida State Attorney in September 2011, Euler did not notify Marble Bridge as the beneficiary of the Euler-Nature's Own policy regarding the criminal investigation. **MBFG Additional Fact WW.**

Notwithstanding that Euler knew, via the 2007 newspaper article, that International Air Cargo was a fraudulent company, coupled with Euler's knowledge via the Hanson phone call in September 2011 that Equipack was under criminal investigation, Euler continued to maintain and/or approve credit limits for International Air Cargo and Equipack. **MBFG Additional Fact XX.**

On October 27, 2011, despite the criminal investigation, Euler issued renewal credit insurance Policy No. 5041669 to Nature's Own, Inc., covering a policy period from November 1, 2011 through October 31, 2012 ("Second Policy"). **MBFG Additional Fact YY; Marble DFs to Euler Fact 10.**

In addition to what they previously knew, Euler Assistant General Counsel Stuehrmann and Euler suspected there was fraud and/or improper conduct by Nature's Own and the Nature's Own buyers as early as February 9, 2012, when Euler received a high risk alert on International Air Cargo. **MBFG Additional Fact ZZ.**

On February 12, 2012, Stuehrmann called Florida Attorney General Hanson because of the high risk alerts on some buyers and because Stuehrmann's review of Euler files indicated there were more buyers involved, including Apothecary, Equipack, Florida Beef, International Air Cargo, and others (all connected to the Nature's Own policies used to defraud MBFG). **MBFG Additional Fact AAA.** Hanson confirmed to Stuehrmann that the companies Stuehrmann identified were considered suspicious and were under investigation. **MBFG Additional Fact BBB.**

Stuehrmann and Euler were aware of the fraud when Euler cancelled the credit limits beginning on February 27, 2012, before Marble Bridge filed its claims. **MBFG Additional Fact CCC.**

Not only did Euler know about the fraud by Nature's Own and its buyers before the Marble Bridge insurance claims, Euler instructed its agents to remain silent and not tell anyone. **MBFG Additional Fact DDD.** Leonard Freeman was a Euler sales agent in Florida who, on February 27, 2012, received notice of the same credit limit cancellations of buyers as were received for the Nature's Own buyers used to defraud Marble Bridge. **MBFG Additional Fact EEE.** Freeman was ordered in February 2012 to not tell the insureds and beneficiaries about the fraud. **MBFG Additional Fact FFF.**

Stuehrmann has admitted that she put out an order that all inquiries about the credit limit cancellations or Marble Bridge must be referred to Stuehrmann. **MBFG Additional Fact HHH.** Stuehrmann gave that order in February 2012 because she anticipated that Marble Bridge was going to sue Euler. **MBFG Additional Fact III.**

The facts of the instant matter are similar in many respects to *First Alliance*. Analogous to *First Alliance*, officials within Euler exchanged emails explicitly evidencing their knowledge

regarding fraudulent buyers under the Euler-U.S. Hay policy. **MBFG Additional Facts FF, HH, II, KK.** Buyers under the Euler-U.S. Hay policy later resurfaced as fraudulent buyers under Policy One and Policy Two in which Marble Bridge was a beneficiary. **MBFG Additional Fact GG.** Also, akin to *First Alliance*, despite Euler's knowledge of the fraud, Euler refused to disclose such information to beneficiaries, including Marble Bridge. **MBFG Additional Fact FFF.** Given the foregoing, and the similarities between the instant matter and the Court's holding in *First Alliance*, Euler had "actual knowledge" of the fraud.

*Substantial Assistance*

Ordinary business transactions can satisfy the substantial assistance element of an aiding and abetting claim if the entity providing the service knew those transactions were assisting the customer in committing a specific tort. *Casey*, 127 Cal.App.4th at 1145. Knowledge is the crucial element. *Id.* Here, as in *First Alliance*, Euler "substantially assisted" in the fraud by conducting, at least from the perspective of a source outside of Euler, "ordinary business practices" by maintaining and granting credit limit requests for the Nature's Own buyers, despite its knowledge that such buyers were fraudulent. **MBFG Additional Facts W-JJJ.** Euler's role in maintaining and granting credit limit requests facilitated the fraud, as Marble Bridge was induced by such reassurances to continue lending to the Nature's Own buyers. **MBFG Additional Fact C.**

Further, ostensibly in support of Euler's assertion that it did not "substantially" assist in the fraud, Euler argues that it "sought nothing, had nothing to gain and gained nothing from Nature's Own's sale of fraudulent invoices to Marble Bridge." Euler's Motion Page 24, ¶¶ 19-20. In facilitating the fraud, Euler did, however, gain premiums it would not have otherwise received. Further, Euler agents received commissions for bringing in new business and such commissions were "dinged" if the insured did not pay the premium, which created an environment where instances of fraud could foster. **MBFG Additional Fact D**.

Accordingly, Euler's Motion for Summary Judgment as to Marble Bridge's Aiding and Abetting Fraud claim should be denied, as Euler had actual knowledge of the fraud and substantially assisted the fraud.

**2. <u>Fraud and Deceit – Intentional Misrepresentation (Second Claim); Fraud and Deceit – Fraududulent Concealment (Third Claim).</u>**

<u>Euler Intentionally Misrepresented and Fraudulently Concealed from Marble Bridge Information, Known Exclusively to Euler, Regarding the Nature's Own Fraud and, Alternatively, Euler was under a Duty to Disclose such Information, Yet Failed To Do So.</u>

The elements of fraudulent misrepresentation are: (1) the defendant misrepresents material facts; (2) with knowledge of the falsity of the representations or the duty of disclosure; (3) with intent to defraud or induce reliance; (4) which induces justifiable reliance by the plaintiff; (5) to his or her detriment. *Hahn v. Mirda,* 147 Cal.App.4th, 740, 748 (2007).

Similarly, the elements of fraudulent concealment are: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Lovejoy v. AT&T Corp.,* 119 Cal.App.4th 151, 157–158 (2004).

A false representation is the suggestion, as a fact, of something untrue by one who does not believe it to be true. Cal. Civ. Code §1710 (1). To give rise to an action for fraud, a misrepresentation need not be express but may be implied by or inferred from the circumstances. *Thrifty-Tel, Inc., v. Bezenek*, 46 Cal.App.4th 1559, 1567 (1996).

Euler's Motion for Summary Judgment as to Marble Bridge's Seconda and Third Claims, Fraud and Deceit–Intentional Misrepresentation and Fraud and Deceit–Fraudulent Concealment, respectively, are grounded in the assertion that Euler did not know about the Nature's Own fraud, and accordingly did not and could not have made any misrepresentation or have the

necessary intent to deceive or induce reliance from Marble Bridge. Euler does not discuss or contest the other elements required for proving intentional misrepresentation, specifically justifiable reliance, and the detriment incurred by Marble Bridge. Accordingly, Euler has waived such arguments. See *Clark v. County of Tulare*, 755 F.Supp.2d 1075, 1090 (E.D.Cal. 2010) (reasoning that it is improper for the moving party to "shift gears" and introduce new facts or different legal arguments in the reply brief than presented in the moving papers); *See also Lujan v. National Wildlife Federation,* 497 U.S. 871, 894–895 (1990) (court has discretion to disregard late-filed factual matters); *Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir.2007) ("district court need not consider arguments raised for the first time in a reply brief").

The key distinguishing feature between a cause of action for intentional misrepresentation and a cause of action for fraudulent concealment is that to state a cause of action for fraudulent concealment, the defendant must have been under a *duty* to disclose some fact to the plaintiff, yet failed to do so. *Hahn*, 147 Cal.App.4th at 748. Again, in its Motion, Euler does not address any issues regarding whether Euler had a duty to disclose knowledge of the fraud, ostensibly because of its argument that it had no knowledge of the fraud in the first place. Accordingly, Euler's potential argument regarding its duty to disclose knowledge to Marble Bridge is waived. See *Clark,* 755 F.Supp.2d at 1090; *Lujan,* 497 U.S. 871, 894–895 (1990); *Zamani,* 491 F.3d at 997.

As set forth in section (B)(1), titled "Aiding and Abetting Fraud" of the instant Opposition, Euler knew of the Nature's Own fraud, and actively concealed such knowledge from Euler. Euler knew in September 2011 that US Hay Direct, Equipack LLC, Kay Holloway and Greg Winters were under criminal investigation by the Florida State Attorney General Office. **MBFG Additional Fact QQ.** Euler knew, at the time Marble Bridge became a beneficiary under the Policy, that buyers on the Euler-Equipack policy (in which Gulf Coast was a beneficiary) included Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle. **MBFG Additional Fact OO.** Euler knew, at the time Marble Bridge became a beneficiary under the Policy, that buyers on the Euler-U.S. Hay policy (in which Factor King was a

beneficiary) included the same buyers, specifically Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle. **MBFG Additional Fact OO.** Euler knew that the buyers on the Euler-Nature's Own policy (in which Marble Bridge was a beneficiary) included Rancho Linda Marchadores, with Nature's Own serving as the Insured. **MBFG Additional Fact GG, Marble DF to Euler Fact 10.** Euler also knew that Equipack LLC, under criminal investigation by Hanson, was a Nature's Own buyer. **MBFG Additional Fact MM; QQ.**

Further, notwithstanding that Euler knew, via the 2007 newspaper article, that International Air Cargo was a fraudulent company, coupled with Euler's knowledge via the Hanson phone call in September 2011 that Equipack was under criminal investigation, Euler continued to maintain and/or approve credit limits for International Air Cargo and Equipack. **MBFG Additional Fact XX.**

Therefore, contrary to Euler's assertion that "there remains no evidence that Euler knew, actually or otherwise" of the Nature's Own fraud, Euler had ample evidence of the fraud, and even ordered Euler employees to conceal such knowledge from Marble Bridge. **MBFG Additional Fact W-JJJ.** Given the foregoing, Euler's Motion for Summary Judgment as to Marble Bridge's Second Claim for Intentional Misrepresentation and Third Claim for Fraudulent Concealment should be denied.

**3. Negligent Misrepresentation (Fourth Claim).**

Negligent misrepresentation is defined as: "The assertion, as a fact, of that which is not true, by one who has *no reasonable ground* for believing it to be true." Cal. Civ. C. §1710(2).

A cause of action for negligent misrepresentation is similar to an action for fraud, except that intent to deceive is unnecessary. *Intrieri v. Superior Court,* 117 Cal.App.4th 72, 85–86 (2004). Instead, a defendant may be liable for negligent misrepresentation when it makes a false statement, honestly believing it to be true, but without reasonable grounds for such belief. *Id.* In addition, the aggrieved party must have been ignorant of the true facts and was damaged by justifiable but erroneous reliance on the representation. *Rios v. Scottsdale Ins. Co.*, 119 Cal.App.4th 1020, 1029 (2004).

a. <u>Euler's Maintenance and Granting of Credit Limits for Buyers under the Euler-Nature's Own Policy was a "Positive Assertion," triggering liability for Negligent Misrepresentation.</u>

Negligent misrepresentation may not be based on an implied representation; the representation must be a "positive" assertion. See *Byrum v. Brand*, 219 Cal.App.3d 926, 942 (1990). When a statement, although in the form of opinion, is not a casual expression of belief, but a deliberate affirmation of matter stated, it may be regarded as positive assertion of fact for purposes of the tort of negligent misrepresentation. *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 408 (1992). Expressions of opinion do not constitute a ground for an action of fraud, yet when statements of value are made with purpose and intent of deceiving and defrauding another, and when made under such circumstances as would indicate defrauded party relies on speaker's knowledge and statements, a positive representation of value may be actionable fraud. *Salvati v. Cusolito*, 98 Cal.App.2d 582, 584 (1950). Further, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact. *California Public Employees' Retirement System (CalPERS) v. Moody's Investors Service, Inc*., 226 Cal.App.4th 643, 662 (2014).

For example, in *California Public Employees' Retirement System (CalPERS) v. Moody's Investors Service, Inc*., 226 Cal.App.4th 643 (2014), CalPERS brought an action against credit rating agencies for negligent misrepresentation, among other claims. CalPERS challenged the veracity of the Rating Agencies' assignment of highly favorable credit ratings to structured investment vehicles ("SIVs") that ultimately collapsed, causing billions of dollars in losses to CalPERS and other investors. *Id.* at 651, 652. As a general matter, the ratings represent an Agency's "assessment of the likelihood that a SIV noteholder will be paid the expected amount of principal and interest through the note's maturity date." *Id.* at 652. Before assigning a particular rating, the Rating Agency conducts detailed research and risk analysis with respect to

the SIV notes. *Id.* Once a rating is given, it is published in the SIV's offering materials and made available to potential investors. *Id.* at 653.

In holding that the Agencies' ratings were actionable under CalPERS' negligent misrepresentation claim, the Court reasoned that "the Rating Agencies published the ratings from a position of superior knowledge, information and expertise regarding the SIVs' composition, underlying structure and function that was not generally available in the market" (*Id.* at 664) and that "CalPERS has provided sufficient evidence to make a prima facie showing that the representations embodied in the ratings reflect not just professional opinions regarding an event in the future such as the likelihood of default, but also regarding a past or existing fact—namely, the then-current composition and quality of the SIV product." *Id.*

In its Motion, Euler cites the following allegation, contained in Marble Bridge's First Amended Complaint:

> "In addition, after Euler included Marble Bridge as a beneficiary of the Euler-Nature's Own credit insurance policy in June 2011, in September 2011 Euler was informed by the Florida State Attorney's Office that companies identified as Nature's Own buyers that were insured under the Euler-Nature's Own policy naming Marble Bridge as the beneficiary were under criminal investigation by Florida law enforcement. Even with such knowledge, Euler refused to investigate the information and continued to raise credit limits of the companies under criminal investigation. In so doing Euler misrepresented and concealed material facts to Marble Bridge about the creditworthiness of Nature's Own and the Nature's Own buyers, inducing Marble Bridge to increase its lending to the Fraudulent Participants even though Euler knew that those participants were the subjects of a criminal investigation." Euler Motion Page 31 ¶23-27, Page 32 ¶1-5.

Euler asserts that "[a]t best, this would amount to a 'negligent omission,' not a 'positive assertion,' and thus cannot form the basis of a claim for negligent misrepresentation." Contrary to Euler's argument, Euler's maintenance and granting of credit limits for the Nature's Own buyers, despite the fact Euler knew such buyers were under investigation, is a "positive assertion" actionable for a negligent misrepresentation claim.

Here, akin to the Rating Agencies' representations regarding the financial strength/security of the SIVs in the *CalPERS* case, Euler's maintenance and granting of credit limits for the Nature's Own buyers was an affirmative representation that the buyers were credit

worthy. Indeed, Marble Bridge became a beneficiary under the Policy, agreed to the renewal of the policy, and based its lending decisions on such representations. **MBFG Additional Fact B.** Further, similar to the Rating Agencies in *CalPERS*, Euler was in a position of superior knowledge relative to Marble Bridge. Indeed, Euler, a multi-billion dollar company, Euler also held itself out as able to provide the increased ability to provide risk management, credit due diligence, and underwriting services to its insureds and the beneficiaries and loss payees of its credit insurance policies, including ongoing account monitoring with specialized risk underwriters utilizing a proprietary data base, and that Euler performed on-site visits to account debtors' businesses. **MBFG Additional Fact A.**

Again, Marble Bridge, as a relatively modest commercial finance company with approximately 12-13 employees in or around 2011 and 2012, relied on such representations in agreeing to become a beneficiary under the Policy and in subsequently increasing its lending to Nature's Own. **MBFG Additional Fact C.**

Euler also asserts, without reference to any supporting evidence, that there was "no information that Nature's Own, Anette Zimmerman, Richard Wallace or any of the Buyers under the Nature's Own policy actually were 'under criminal investigation' by law enforcement, either in Florida or anywhere else. This was not known until after Marble Bridge had stopped funding Nature's Own, on January 13, 2012, and there is no evidence otherwise."

In her deposition, Euler's Assistant Corporate Counsel, Deborah Stuehrmann, testified that in September 2011, Florida State Attorney General Phil Hanson called Stuehrmann and informed her that the Florida State Attorney General was conducting a criminal investigation regarding U.S. Hay, Equipack LLC, Kay Holloway, and Greg Winters. **MBFG Additional Fact QQ**. The individuals and entities revealed by Hanson to Stuehrmann were known by Euler to be participants in the Factor King claim, and Factor King had already sued Euler. **MBFG Additional Fact SS**. Euler knew that the buyers listed for the Euler-U.S. Hay Direct policy included Rancho Linda Marchadores, Iberian Horse, and Phantom Sport Horse, which were all also Nature's Own buyers. **MBFG Additional Fact TT**. Euler knew that Equipack LLC was

also a Nature's Own Buyer. **MBFG Additional Fact VV**. Therefore, contrary to Euler's assertion, which was again unsupported by any evidence, Euler did indeed have knowledge that the Nature's Own buyers were under criminal investigation.

b. Euler knew or should have known that the companies they represented to be credit worthy were in fact not, and it was unreasonable for Euler to represent them as credit worthy.

California law has specifically held that a defendant may be held liable for negligent misrepresentation in the dissemination of commercial information to persons who were "intended beneficiaries" of the information with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation. *Anschutz Corp. v. Merrill Lynch and Co. Inc.,* 785 F.Supp.2d 799, 825-827 (N.D. Cal. 2011) (citing *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 410-413 (1992)). Marble Bridge was an intended beneficiary of the information Euler misrepresented in its marketing materials. Indeed, Euler expressly targeted Marble Bridge through its dissemination of false commercial information on several occasions. Such materials induced Marble Bridge to agree to become a beneficiary under the Policy and to lend funds to the Nature's Own buyers.

Here, Euler's marketing materials made false representations to Marble Bridge and, to many others, that Euler maintained a proprietary database containing information on 40,000,000 companies, and that Euler conducted on-site, high-risk debtor visits to assimilate information. **MBFG Additional Fact A.** The Marketing materials were intended to induce Marble Bridge to purchase credit insurance or to become a beneficiary of Euler insurance policies and fund Euler insured buyers, and were effective in this regard. **MBFG Additional Facts B, C.**

Although Marble Bridge became a beneficiary under the Policy on October 27, 2011, it was not until January/February of 2012 that Marble Bridge began to have suspicions regarding Nature's Own and the Nature's Own Buyers. **Marble DF to Euler Fact 57.** Otherwise, Marble Bridge was ignorant of the true state of affairs regarding Nature's Own and the Nature's Own buyers. **MBFG Additional Fact M.**

Further, as previously set forth, Euler had no reasonable grounds for believing Nature's Own and/or the Nature's Own Buyers were legitimate. **MBFG Additional Facts W-JJJ.** Euler's Motion for Summary Judgment as to Marble Bridge's Negligent Misrepresentation claim should be denied.

**C. <u>There Exist Material Disputes of Fact as to Each of Marble Bridge's Contract-Based Claims, Specifically Declaratory Relief (Fifth Claim) and Breach of Contract (Sixth Claim), and, therefore, Euler's Motion for Summary Judgment As to Those Claims Should Be Denied.</u>**

**1. The Initial Policy, issued by Euler to Nature's Own on November 1, 2010, and the Renewed Policy, Renewed November 1, 2011, are Separate and Distinct Policies.**

Like contracts in general, an insurance policy may include provisions not physically a part of the policy, so long as they are sufficiently incorporated by reference. Incorporation by reference requires:

1) the reference to another document was *clear and unequivocal*;

2) the reference was *called to the attention* of the other party, who consented to that term; and

3) the terms of the incorporated documents were known *or easily available to* the contracting parties. *Kleveland v. Chicago Title Ins. Co.*, 141 Cal.App.4th 761, 765 (2006); *Wolschlager v. Fidelity Nat. Title Ins. Co.*, 111 Cal.App.4th 784, 790 (2003).

On November 1, 2010, Euler issued a "Domestic Markets Business Credit Insurance Policy ("Policy One") to Nature's Own Pharmacy, LLC. **Marble DFs to Euler Fact 10.** Policy One was designated Policy No. 5033862. **Marble DFs to Euler Fact 10.** The "policy period" for Policy One is from November 1, 2010 through October 31, 2011. **Marble DFs to Euler Fact 10.** On or about July 3, 2011, Marble Bridge signed a "Bank/Lender Policy Beneficiary Endorsement" wherein Marble Bridge became a beneficiary under Policy One, and is identified as Nature's Own's Inc.'s bank/lender. **Marble DFs to Euler Fact 10.**

On November 1, 2011, Policy One was renewed (hereinafter referred to as "Policy Two") and provided a different policy number (Policy No. 5041669), and different policy period (November 1, 2011 through October 31, 2012) than Policy One. **Marble DFs to Euler Fact 10.** Marble Bridge remained a beneficiary under Policy Two. **Marble DFs to Euler Fact 10.**

The policies are separate and distinct, they are not one policy. **Marble DF to Euler Fact 10.** Indeed, both Policy One and Policy Two, respectively provide, in part, that: "[r]enewal Policy means a Policy we issue to you which provides continuous coverage for another Policy Period in exchange for your payment of Premium. <u>The terms of any Renewal Policy may be different from the terms in this Policy."</u> [emphasis added]. **Marble DF to Euler Fact 10; Hurley Dec., Ex. A, Ex. B.** Within Policy Two, there is no reference to Policy One, Policy One's policy number, or Policy One's policy period. **Marble DF to Euler Fact 10; Hurley Dec. Ex. B.** Accordingly, Policy Two does not contain a *clear and unequivocal* reference to Policy One, nor did Euler call to the attention of Marble Bridge that Policy One and Policy Two were, in fact, one policy. See *Kleveland*, 141 Cal.App.4th at 765. Policy One and Policy Two are separate and distinct policies. As set forth in further detail below, Euler breached each respective policy.

**2. Euler Breached Policy One and Policy Two, respectively; Marble Bridge is entitled to Coverage under Each Policy; and, Euler is Equitably Estopped from Denying Marble Bridge Coverage under the Policy.**

a. <u>Euler Breached the Express Terms of Policy Two by Cancelling Credit Limits for Buyers on Each Policy Without Providing Written Notice to Marble Bridge.</u>

Marble Bridge concedes that one of its experts opined that there is no coverage under either policy for Marble Bridge's claim based on the lack of goods, shipments and/or deliveries to the buyers. Euler's Separate Statement Facts 64, 65. Irrespective of the coverage issue, Euler nonetheless breached Policy Two by failing to provide written notice to Marble Bridge regarding each and every credit cancellation. Indeed, Policy Two provides that Euler "[has] the right to reduce or cancel a **Credit Limit** on a **Buyer** for future **Shipments** by giving [Marble Bridge]

written notice." **Marble DF to Euler Fact 10;** Hurley Dec., Ex. B**.**

On February 27, 2012, Marble Bridge received notice that credit limits for five buyers/debtors on the Policy had been cancelled. Euler's Separate Statement Fact 49. Mr. Candau's deposition testimony on this issue, as quoted in Euler's brief, further supports the fact that Euler failed to provide notice as to *each* cancellation: "we [Marble Bridge] were provided notice that Euler cancelled *some* of the credit limits somewhere in that time frame [February 27, 2012]. Euler's Separate Statement Fact 49. [Emphasis added].

In or around February 27 or 28, 2012, Mr. Candau talked to Euler agent John Fitzgerald by telephone to ask why the credit limits on five buyers were canceled. **MBFG Additional Fact I.** At that time Mr. Candau did not know that seven more credit limits were canceled for which no notifications were sent. **MBFG Additional Fact J.** Between February 27, 2012, and March 6, 2012, Marble Bridge discovered via the Euler computer network that Euler had cancelled additional credit limits on buyers on Policy Two without notifying Marble Bridge. **MBFG Additional Fact K.** Accordingly, Euler's failure to provide written notice as to each and every credit cancellation for the buyers under Policy Two is a breach of that Policy.

Euler's Motion for Summary Judgment as to Marble Bridge's Breach of Contract claim should therefore be denied.

b. <u>Marble Bridge is entitled to Coverage under the Policy.</u>

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. Absent evidence indicating the parties intended a special usage, words used in an insurance policy should be interpreted in their "ordinary and popular sense." Cal. Civ. Code §1644l; *AIU Ins. Co. v. Sup.Ct. (FMC Corp.),* 51 Cal.3d 807, 821-822 (1990). If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning. *AIU Ins. Co.*, 51 Cal. 3d at 822. Finally, because an endorsement to an insurance policy forms a part of the insurance contract, the policy and the endorsement

must be construed together. *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1463 (2007).

Here, Marble Bridge is an express beneficiary and loss payee of both Policy One and Policy Two pursuant to the Bank/Lender Policy Beneficiary Endorsements [Endorsement] contained therein, entitled to file claims or request loss settlements under the Policy. Euler Separate Statement Fact 32. As conceded in Euler's Motion for Summary Judgment, "Marble Bridge's rights as a beneficiary [under both Policy One and Policy Two] are *co-extensive* with Nature's Own's (and no greater) . . ." Euler's Motion, Page 10, ¶ 3-4 . [Emphasis added]. Indeed, the Endorsement itself provides that Marble Bridge "will have the *same rights* under this Policy and none other as [Nature's Own] would have had if this Endorsement had not been issued." Euler Separate Statement Fact 32; Hurley Dec. ¶3, **Exhibit H (pg 1, ¶4)**. [Emphasis added].

The Endorsement provides, in relevant part, "[a]ll amounts paid to [Marble Bridge] will be in complete satisfaction of amounts that would *otherwise* be payable to [Nature's Own]." [Emphasis added.] Hurley Dec. ¶3, **Exhibit H (pg. 1, ¶6)**. Because Marble Bridge's rights under each Policy are *co-extensive* with that of Nature's Own, coupled with the fact that one of Nature's Own's rights under the Endorsement is that payments made to Marble Bridge satisfy amounts otherwise payable to Nature's Own, Marble Bridge is entitled to the same right, namely, payments made to Nature's Own will satisfy amounts that would otherwise be payable to Marble Bridge.

On March 6, 2012, Euler sent a letter to Nature's Own offering to repay all premiums in exchange for Nature's Own agreeing that the policy was rescinded from inception. **MBFG Additional Fact GGG**. Under the aforementioned terms of the Endorsement, Euler's offer to repay the criminals is an implicit concession that such payments were due to Marble Bridge, as payments [or in this case, an offer of payment] made to Nature's Own satisfy amounts that would *otherwise* be payable to Marble Bridge.

Euler denied Marble Bridge coverage and did not repay premiums to either Nature's Own or Marble Bridge. Euler's Separate Statement Fact 66. Failure to repay such premiums is a breach of the terms of the Endorsement. Accordingly, Euler's Motion for Summary Judgment regarding Marble Bridge's breach of contract and declaratory relief claims, should, respectively, be denied.

c. Due to Euler's Knowledge of and Concealment of the Fraud Regarding Nature's Own, Euler is Equitably Estopped from Denying Marble Bridge Coverage under the Policy.

Euler is estopped, based on its knowledge and concealment of the fraud regarding Nature's Own, from denying Marble Bridge coverage.

An insurer may be estopped to assert a policy right or defense where, by words or conduct, the insurer has caused the insured reasonably to change its position to its detriment. [See Cal. Evid. Code § 623; *Chase v. Blue Cross of Calif.*, 42 Cal.App.4th 1142, 1157 (1996). Generally four elements must be present to establish an equitable estoppel:

— the insurer must be *aware* of the facts;

— the insurer must *intend* that its conduct be acted upon (or must so act that the insured had a right to believe the insurer so intended);

— the insured must be *ignorant* of the true state of facts; and

— the insured must *rely* upon the insurer's conduct to his or her injury. See *Colony Ins. Co. v. Crusader Ins. Co.,* 188 Cal.App.4th 743, 751 (2010).

The insured need not prove that the insurer possessed the intent to mislead the insured. "An insurer is estopped from asserting a right, even though it did not intend to mislead, as long as the insured reasonably relied to its detriment upon the insurer's action." *Chase*, 42 Cal.App.4th at 1157.

Here, it should be initially noted that Marble Bridge is not seeking, via estoppel, for coverage of risks not covered by the terms of either Policy. See *Dollinger DeAnza Assocs. v. Chicago Title Ins. Co.,* 199 Cal.App.4th 1132, 1154 (2011) (determining that the doctrine of estoppel, based upon the conduct or action of the insurer, is not available to bring within the

coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom.). Indeed, each Policy itself provides coverage for "non-payment of amounts due from a covered **Buyer** for **Shipments** of **Covered Products** . . ." Euler's Separate Statement Fact 19; **Hurley Dec. ¶¶ 2, 4, Exhibit A (pg 1, Section IIA), B (pg 1, Section IIA)**. Further, in its Motion for Summary Judgment, Euler erroneously asserts that Marble Bridge admits the following:

> "[a] sine qua non for coverage under the Policy (and any credit insurance policy) is that there be actual 'Covered Products' that are actually 'Dispatched' and 'Delivered' to a 'Buyer' and that "[j]ust because somebody prints out an invoice and claims that it is 'unpaid' does not provide a basis for coverage." Euler Motion, Page 8 ¶ 19-22.

Contrary to Euler's assertion, Marble Bridge made no such admission. **Hurley Dec. ¶6, Exhibit J (¶ 24.)**

*i. The insurer must be aware of the facts.*

As set forth in section (B)(1), of the instant Opposition, Euler had knowledge of the Nature's Own fraud well before Marble Bridge filed its claims, and concealed such knowledge from Marble Bridge. Therefore, this element for estoppel has been met.

*ii. The insurer must intend that its conduct be acted upon (or must so act that the insured had a right to believe the insurer so intended).*

Euler knew Nature's Own and the Nature's Own buyers were fraudulent, and maintained/granted credit limits in order to continue receiving premiums under the policy. **MBFG Additional Facts W-JJJ**. Euler Vice President and Euler agents intended to sell insurance policies or facilitate factoring in order to make commissions, even if it required "screwing another factor." **MBFG Additional Facts D, E.**

Euler's marketing materials made false representations to Marble Bridge that Euler maintained a proprietary database containing information on 40,000,000 companies, and conducted on-site high-risk debtor visits to assimilate information. **MBFG Additional Fact A**. The Marketing materials were intended to induce Marble Bridge to purchase credit insurance or to become a beneficiary of Euler insurance policies and fund Euler insured buyers. The marketing materials accomplished their intended influence, as Marble Bridge relied on such

representations in becoming a beneficiary under the Euler-Nature's Own Policy. **MBFG Additional Facts B, C.**

Based on the foregoing, this element for estoppel has been met.

*iii. The insured must be ignorant of the true state of facts.*

In July 2011, Marble Bridge was named as a policy beneficiary on the Euler credit insurance policy for which Nature's Own was an insured. Euler's Separate Statement 32. In or around January 2012, Marble Bridge was contacted by another small business lender regarding that lender's problems with getting payments from Nature's Own in Nature's Own's capacity as a buyer on an insurance policy. **MBFG Additional Fact N**. Based on this information, Marble Bridge President and CEO Paul Candau began to have suspicions regarding Nature's Own and Nature's Own's buyers. **MBFG Additional Fact O.**

Marble Bridge subsequently hired an investigator to inspect Nature's Own and the Nature's Own's buyers. Euler Separate Statement Fact 55. The results of the investigation further heightened Marble Bridge's suspicions that Nature's Own was fraudulent. **MBFG Additional Fact R.** Therefore, it was not until January/February of 2012, after Marble Bridge had purchased a face value of invoices worth approximately $2,823,331.65, that Marble Bridge began to have suspicions regarding Nature's Own and the Nature's Own buyers. **MBFG Additional Facts M-R.** On February 27, 2012, Euler cancelled credit limits on the Nature's Own buyers, (Euler Separate Statement Fact 48) and Marble Bridge subsequently filed claims with Euler on March 7, 2012. Euler Separate Statement Fact 50. This element is met.

*iv. the insured must rely upon the insurer's conduct to his or her injury.*

In reasonable reliance on Euler's continuing representations and without necessary information because of Euler's concealment and omissions, Marble Bridge agreed to become a beneficiary under the Policy and agreed to the renewal of the Policy. **MBFG Additional Fact B.** In making its lending decisions, Marble Bridge relied on Euler's marketing materials and representations regarding the credit-worthiness of buyers. **MBFG Additional Fact C.** This element is met.

The elements of estoppel have been met. Accordingly, Euler is equitably estopped from contending that coverage should be denied to Marble Bridge due to any lack of actual Shipments of Covered Goods under the Policy.

Euler's Motion for Summary Judgment as to Marble Bridge's breach of contract claim should be denied.

**D. <u>There Exist Material Disputes of Fact as to Marble Bridge's Seventh Claim for Relief, Breach of the Implied Covenant of Good Faith and Fair Dealing, and, therefore, Euler's Motion for Summary Judgment Should Be Denied.</u>**

The law implies a covenant of good faith and fair dealing in every contract, including insurance policies. *Wilson v. 21st Century Ins. Co.* 42 Cal.4th 713, 720 (2007). The fundamental principle of the implied covenant of good faith and fair dealing is "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Gruenberg v. Aetna Ins. Co*., 9 Cal.3d 566, 573 (1973); *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 36 (1995). Allegations asserting a "bad faith" claim must show that the defendant's conduct:

— demonstrates a *failure or refusal* to discharge contractual responsibilities,

— (that is) prompted not by an honest mistake, bad judgment or negligence but rather by a *conscious and deliberate* act, and thereby

— *disappoints the reasonable expectations* of the other party thereby depriving that party of the benefits of the agreement. *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346 (2001).

In order to state a claim for breach of the implied covenant, there must be a breach of the underlying policy. *Waller,* 11 Cal.4th at 36; *Minich v. Allstate Ins. Co.,* (2011) 193 Cal.App. 4th 477, 493, (2011). Euler's argument is premised on the notion that there was no underlying breach of the policy, and therefore, there can be no breach of the implied covenant.

*i. Failure or Refusal to Discharge Contractual Responsibilities.*

As previously set forth in section (C)(1)(a)-(c) of the instant Opposition, Euler breached the express terms of Policy Two, Marble Bridge is entitled to coverage under both Policy One and Policy Two, and finally, Euler is estopped from contending that coverage should be denied. Accordingly, the first of the three elements for proving breach of implied covenant of good faith and fair dealing is met.

*ii. Prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act.*

Well before Marble Bridge filed its claims with Euler, Euler knew of the Nature's Own fraud. **MBFG Additional Facts W-JJJ.** Indeed, Euler knew in February 2012 that there was a connection between the Florida fraud and the California fraud in which MBFG was the victim because the same buyers were on both policies. **Marble DFs to Euler Fact 58.** Euler did not tell policyholders or beneficiaries, including MBFG, of the discovery of the connections between the Florida fraud and the California fraud in which MBFG was the victim; Euler simply canceled credit limits on the policies. **Marble DFs to Euler Fact 59**; **MBFG Additional Fact FFF**.

Euler's decision to continue to maintain and grant credit limits on the fraudulent Nature's Own buyers was not via an honest mistake, bad judgment, or negligence. Rather, Euler knew such buyers were fraudulent, and maintained/granted credit limits in order to continue receiving premiums under each policy. **MBFG Additional Facts W-JJJ.**

Further, Euler Vice President and Euler agents intended to sell insurance policies or facilitate factoring in order to make commissions, even if it required "screwing another factor". **MBFG Additional Fact E.** This element is met.

*iii. Disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.*

In agreeing to become a beneficiary under Policy One, Marble Bridge relied on the express terms of the contract and on Euler's representations regarding its purported underwriting and risk underwriting procedures. **MBFG Additional Fact B.** Marble Bridge's expectations pertaining to both Policy One and Policy Two, respectively, were frustrated via Euler's

respective breach of each policy and Euler's corresponding tortious actions. **MBFG Additional Fact JJJ.**

Euler's Motion for Summary Judgment regarding Marble Bridge's claim for breach of the implied covenant of good faith and fair dealing should be denied.

**E. There Exist Material Disputes of Fact as to Marble Bridge's Eighth Claim for Relief, Unfair Competition under California Business and Professions Code Section 17200, and therefore, Euler's Motion for Summary Judgment Should Be Denied.**

California's Unfair Competition Law ("UCL"), set out in California Business & Professions Code section 17200, allows recovery against a business engaged in *any* of the following: an unlawful, unfair, or fraudulent business practice or practice and unfair, deceptive, untrue, or misleading advertising. Bus. & Prof. Code § 17200.

Section 17200 "borrows" violations from other laws by making them independently actionable as unfair competitive practices. *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1143 (2003). In addition, under section 17200, a practice may be deemed unfair even if not specifically proscribed by some other law. *Id.* The unfair competition statute is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. *Hewlett v. Squaw Valley Ski Corp.,* 54 Cal.App.4th 499, 519 (1997).

A business practice is "unfair" within the meaning of Bus. & Prof. Code section 17200 "when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [*Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.,* 92 Cal.App.4th 886, 894, (2001); see *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal.App.4th 508, 515 (2002) —unfairness "prong" intentionally broad to allow "courts maximum discretion to prohibit new schemes to defraud"]

An advertisement is "misleading" within the meaning of the UCL if a reasonable consumer would likely be misled. *Chapman v. Skype Inc.,* 220 Cal.App.4th 217, 226-227 (2013). The question whether consumers are likely to be deceived is generally a question of fact.

*Id.* Finally, a claim under the UCL is equitable in nature; there is no private cause of action for damages. *Korea Supply Co.,* 29 Cal.4th at 1144. Therefore, suits under the UCL are limited to injunctive relief and restitution. *Id.*

a. <u>There remain Questions of Fact as to whether Funds sent by Nature's Own, and received from Euler, included misappropriated money lent by Marble Bridge</u>.

Euler's Motion regarding Marble Bridge's UCL claim is centered on available remedies and damages; Euler simply ignores Marble Bridge's allegations regarding Euler's wrongful conduct. Euler contends that "[t]he limited premiums Euler received in connection with the Policy were paid by Nature's Own, not by Marble Bridge" (Euler's Motion page 15) and that "Marble Bridge merely speculates, without any evidentiary support, that Nature's Own used money advanced by Marble Bridge to pay premiums." (Euler's Motion page 15). Therefore, according to Euler, there is no restitutionary relief available for Marble Bridge under the UCL, and the UCL claim should therefore be dismissed.

The criminals behind the Nature's Own fraud utilized a "Ponzi scheme" to defraud lenders such as Marble Bridge, with vast sums of money being shifted from entity to entity in order to fund the scheme. Euler Fact 78. It is undisputed that Nature's Own paid premiums to Euler in accord with the each Policy. **MBFG Additional Fact F.** Given the basic nature of a Ponzi scheme, there is a reasonable question of fact as to whether Marble Bridge's misappropriated funds were funneled to Euler in the form of premiums, fees and other charges paid to Euler by the criminals. Emails between Euler officials illustrate that Nature's Own was not paying premiums until Marble Bridge sent money, including similar sequences with other frauds involving Holloway. **MBFG Additional Fact F; Hurley Dec. ¶26, Exhibit AA.**

b. <u>There is no adequate remedy at law</u>.

Euler alternatively argues that Marble Bridge's UCL claim should be dismissed because "California courts hold that [UCL] claims should be dismissed where a plaintiff's proper remedy in a coverage case is to sue for breach of contract to recover any benefits due under a policy."

Euler's authority in support of this proposition, *McAdam v. State Nat'l Ins. Co.*, No 12cv1333 BTM (MDD), 2012 U.S. Dist. LEXIS 136444, *4-5 (S.D. Cal. Sept. 24, 2012) is inapposite.

In *McAdam*, the insured brought suit against his insurance company for (1) breach of insurance contract; and (2) injunctive relief and restitution pursuant to Bus. & Prof. Code section 17200, *et seq.,* among other claims. The Court dismissed the unfair competition claim, holding that the insured had an adequate remedy at law, namely his breach of contract claim. Unlike the instant matter, the insured in *McAdam* did not seek restitutionary relief. See *id.* at 2. ["This lawsuit is about the recovery of benefits under the Policy" and that "[a]lthough the prayer for relief requests restitution, Plaintiff never states that he is seeking the return of premiums paid."]. *Id.*

Here, in contrast to *McAdam*, Marble Bridge is seeking recovery for damages under each Policy *and* for restitutionary damages, specifically "all monies misappropriated from Marble Bridge by the fraudulent scheme and acquired by Euler by means of Euler's unlawful, unfair, and fraudulent business practices." **Hurley Dec. ¶5, Exhibit I (¶192).** The damages Marble Bridge seeks via restitution under its UCL claim (restitution to Marble Bridge of all sums acquired by Euler by means of Euler's unlawful, unfair, and fraudulent business practices) are distinct from those damages sought via its breach of contract claim (amount owed to Marble Bridge under the contract). Accordingly, there is not adequate remedy at law to afford Marble Bridge full relief, and Euler's argument necessarily fails.

c. <u>Euler's violation of California Business and Professions Code section 17500 regarding false or misleading statements triggers liability under California Business and Professions Code section 17200</u>.

"Unfair competition" under Bus. & Prof. Code section 17200 includes "any act prohibited by . . .(section 17500 *et seq*.) of the Bus. & Prof. Code." The false advertising law encompassed in Bus. & Prof. Code section 17500 generally prohibits advertising that contains "any statement . . .which is untrue or misleading, and which is known, or . . .should be known, to be untrue or misleading. . ." Bus. & Prof. Code section 17500.

A violation of Cal. Bus. & Prof. Code section 17500 regarding false or misleading statements triggers liability under California Business and Professions Code section 17200. See *Korea Supply Co.,* 29 Cal.4th at 1143 [stating that Cal. Bus. & Prof. Code section 17200 "borrows" violations from other laws by making them independently actionable as unfair competitive practices.]. Further, misleading advertising itself is a breach under Bus. & Prof. Code section 17200. *Chapman*, 220 Cal.App.4th at 226-227.

In *Wilner v. Sunset Life Ins. Co.,* 78 Cal.App.4th 952 (2000) the court held that plaintiff validly stated a cause of action under the UCL based on allegations that the defendant made false statements though its marketing which fraudulently induced contracts with purchasers. *Id.* at 964-967. In *Parino v. BidRack, Inc.,* 838 F.Supp.2d 900, 906 (N.D.Cal. 2011), the court took up the issue of marketing as evidence of the inducement of fraud. In that case, the court held that defendant knew or should have known that its representations in multiple statements on their website were untrue, and defendant designed their marketing scheme of respectable news stories and endorsements in order to induce the plaintiff and others to register so that defendant could charge a fee. *Id.* The court found the plaintiff's reliance was justifiable, especially in light of the fraudulent news stories and endorsements lending the defendant credibility. *Id.*

As in *Parino*, Euler made numerous misleading statements in advertising to Marble Bridge, endorsing the credit worthiness of its insured companies. Euler sent essentially the same marketing materials with the same misrepresentations from Euler numerous times. **MBFG Additional Fact A.** Euler Vice President John Fitzgerald emailed marketing materials to Marble Bridge in 2006 on two occasions, and multiple times in 2011. **MBFG Additional Fact A.** In addition to Euler providing its complete marketing information package with its false representations and promises to MBFG with the same representations between 2006 and 2012, Euler representatives made the same representations in telephone conversations as part of its scheme to induce Marble Bridge to buy out Liquid Capital. **MBFG Additional Fact A.** Euler's marketing materials made representations to Marble Bridge and, to many others, that Euler maintained a proprietary database containing information on 40,000,000 companies, received

monthly past due information of 50,000 companies, and that Euler conducted on-site debtor visits of high risk debtors to assimilate information. **MBFG Additional Fact A.** The Marketing materials were intended to induce Marble Bridge to purchase credit insurance or to become a beneficiary of Euler insurance policies and fund Euler insured buyers.

The promises provided by Fitzgerald for Euler were:

"Euler Hermes ACI supports its clients in all aspects of their credit management, its underwriters are industry specialists who will work closely with you to provide in-depth credit analysis and ongoing account monitoring to provide early warning of potential credit risks before they become a loss." **MBFG Additional Fact A. Hurley Dec. ¶27, Ex. BB (Euler 004623).**

Euler utilizes "[a] unique underwriting approach that with risk underwriters specialized in industries and by geographic area, product flexibility and significant underwriting capacity;" **MBFG Additional Fact A; Hurley Dec. ¶27, Ex. BB (MBFG 002971).**

Euler utilizes "[a] dedicated information gathering team that continually updates and enhances Euler Hermes' database with proprietary information on more than 40 million companies around the world;" **MBFG Additional Fact A; Hurley Dec. ¶27, Ex BB (Euler 005106).**

Euler employs "[a] risk management philosophy where financial and credit professionals monitor larger and higher-risk debtors, conduct debtor visits and respond quickly to credit limit requests;" **MBFG Additional Fact A; Hurley Dec. ¶27, Ex. BB (Euler 005132).**

"A Euler Hermes ACI policy will pay you if your customer can't;" **MBFG Additional Fact A; Hurley Dec. ¶27, Ex BB (Euler 005117).**

"Direct receipt of past due information from nearly 50,000 companies on a monthly basis to better track payment patterns." **MBFG Additional Fact A. Hurley Dec. ¶27, Ex. BB (Euler 005132)**.

As in *Parino* where the defendant had reason to know that the statements were misleading, (*Parino,* 838 F.Supp.2d at 906), Euler had ample reason to know of the falsity of its representations. The marketing materials sent to Marble Bridge in 2006 were the same as those

sent in 2011, and Marble Bridge had been informed that at all times the marketing materials reflected current Euler information. **MBFG Additional Fact A.** As previously set forth, well before Euler's sales representatives contacted Marble Bridge again in 2011 in the effort to convince Marble Bridge to become a beneficiary under Policy One, Euler had knowledge of the fraudulent buyers. **MBFG Additional Fact W-SS.** Accordingly, Euler's breach of Bus. & Prof. Code section 17500 is a breach of Bus. & Prof. Code section 17200.

d. Euler does not Address Marble Bridge's Allegations Regarding Wrongful Conduct.

Marble Bridge's UCL claim sets forth allegations regarding Euler's conduct that breaches the UCL. Euler's Motion does not address or dispute Marble Bridge's allegations regarding Euler's wrongful conduct. As previously set forth, well before Marble Bridge filed its claims with Euler, Euler knew of the Nature's Own fraud, concealed such knowledge from Marble Bridge, and subsequently breached the express terms of Policy Two. Euler's actions meet the intentionally broad "unfairness" prong of the UCL, as such actions were not only unethical, but also substantially injurious to Marble Bridge. See *Community Assisting Recovery, Inc.*, 92 Cal.App.4th at 894.

Based on the foregoing, Euler's Motion for Summary Judgment regarding Marble Bridge's claim under Cal. Bus. & Prof. Code section 17200 should be denied.

**F. Marble Bridge's Claims Under RICO Are Properly Before the Court, as Courts Prefer to Decide Cases Based on Their Merits, and Euler's Resulting Prejudice Is Minimal.**

Federal Rule of Civil Procedure ("FRCP") 15 provides the parties with flexibility in presenting their claims and defenses. *Foman v. Davis*, 371 U.S. 178, 182 (1962). It assures that cases will be heard on their merits and avoids injustices that sometimes resulted from strict adherence to earlier technical pleading requirements. *Id.* The policy favoring leave to amend is to be applied with "extreme liberality." *Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013).

Courts may decline to grant leave to amend only if there is strong evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." *Foman*, 371 U.S. at 182. "[T]he consideration of prejudice to the opposing party carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003). However, to justify denial of leave to amend, the prejudice must be *substantial*. *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir. 1990).

On July 9, 2014, Marble Bridge filed a Notice of Motion and Motion for Leave to file an amended complaint. Marble Bridge's amended complaint was attached to the Motion for Leave. Hurley Dec., Ex I. MBFG's proposed claims under RICO were discussed and briefed at length by Euler's attorneys in Euler's Opposition, and subsequently in MBFG's Reply.

The Court's Order regarding MBFG's Motion for Leave to Amend, dated and filed September 3, 2014 (Dkt. No. 170) did not specifically address MBFG's claims with regard to RICO. **Hurley Dec. ¶24, Exhibit Y.** The Court's Order provides, in part, that:

> "Here, the court is not persuaded that *any* of the proposed amendments would be futile or that Plaintiff is seeking to amend in bad faith. In addition, the request (a) to add claims against Defendant for aiding and abetting a fraud and fraud and deceit by misrepresentation and concealment, (b) to change the negligence claim to one for negligent misrepresentation, and (c) to more specifically plead the existing claims against Defendant, neither creates undue delay nor results in undue prejudice to Defendant. Accordingly, the motion is granted as to those claims." [Emphasis added.]

Here, there are a variety of factors that weigh in favor of permitting MBFG's claims under RICO to proceed. First, it is undisputed that courts strongly prefer to hear cases on the merits. *Forman*, 371 U.S. at 182; *Sonoma County Ass'n of Retired Employees,* 708 F.3d at 1117.

Second, the Court's Order specifically provides that "the court is not persuaded that *any* of the proposed amendments would be futile or that [Marble Bridge' is seeking to amend in bad faith." The Court's use of the term "any" of the proposed amendments ostensibly refers to and includes the RICO claims. Indeed, as previously set forth, when Marble Bridge submitted its Motion for Leave, it attached the proposed amended complaint, which contained the RICO

claims. Further, Euler knew that Marble Bridge was seeking to add the RICO claims, evidenced by the fact Euler dedicated approximately three pages in its Opposition discussing such claims, and Marble Bridge discussed Euler's RICO-related arguments in Marble Bridge's Reply brief.

Fourth, the allegations contained in MBFG's RICO-based claims are similar in nature to MBFG's aiding and abetting a fraud claim (which the Court expressly granted MBFG leave to amend to add in its first amended complaint). For example, Marble Bridge's allegations in support of its RICO claims provide, in part:

> "The Fraudulent Participant entities and Euler were involved in pattern of racketeering pursuant to 18 U.S.C. § 1961(5) by defrauding and attempting to defraud multiple lenders during at least a three-year period of time from February 2009 to August 2012. The purpose of the scheme remained consistent during that period of time – to defraud lenders utilizing Euler's assurances of credit worthiness, due diligence, monitoring, and reporting of credit risk whereas the Fraudulent Participant entities lacked any credit worthiness and were known by Euler to be defrauding creditors. Euler knowingly assisted and participated in the fraudulent scheme by hiding the association of the various Fraudulent Participant entities to persons known to be involved in defrauding lenders."
> **Hurley Dec. ¶5, Exhibit I, (¶196).**

Marble Bridge's allegations in support of its aiding and abetting fraud claim, provide in relevant part:

> "At all relevant times Euler had actual knowledge that the fraudulent scheme breached duties owed by the Fraudulent Participants, to factors and accounts receivable financing companies including, without limitation, Marble Bridge, Factor King, Security Credit, Gulf Coast, Interstate Capital, Universal Funding, Greystone Commercial, Transportation Funding Group, Inc., and multiple other entities.
> Euler gave substantial assistance to the fraudulent scheme by, among other things:
> a. Soliciting factors and accounts receivable finance companies, including Marble Bridge, to provide credit to participants in the fraudulent scheme;
> b. Inducing factors and accounts receivable finance companies, including Marble Bridge, to provide credit to participants in the fraudulent scheme by falsely representing that the risk management, credit due diligence, and underwriting services Euler provides to its insureds and the beneficiaries and loss payees of Euler credit insurance policies would protect them from loss . . ."
> **Hurley Dec. ¶5, Exhibit I (¶¶106, 107).**

Given the similarities between the respective RICO and aiding and abetting claims, it makes little sense that the Court would grant Marble Bridge's Motion for Leave regarding the aiding and abetting claim, yet deny Marble Bridge's Motion for Leave regarding the RICO claim.

Finally, the similarity of the allegations between Marble Bridge's aiding and abetting a fraud claim and the RICO claims limits the potential prejudice toward Euler. Indeed, pertinent defenses to both claims would most likely center on Marble Bridge's allegations regarding Euler's knowledge and involvement in the fraudulent scheme. Euler was first apprised of Marble Bridge's RICO claim on July 9, 2014, when Marble Bridge filed its Motion for Leave and attached the proposed amended complaint containing the RICO claims. Euler thus had ample time and opportunity to conduct discovery and craft defenses to such claims. Accordingly, permitting Marble Bridge's RICO claims to remain in this litigation will cause Euler relatively minimal prejudice.

Based on the foregoing, Marble Bridge's claims under RICO should be permitted to move forward in the instant matter.

## III.
## OBJECTIONS TO EVIDENCE

**Objection No. 1**: Euler's Memorandum of Points and Authorities lacks any corresponding citations or reference to its "Separate Statement." Facts are supposed to be in the Separate Statement. Section IV B(1) of the Court's Standing Orders provides, in relevant part, that: [f]or each claim, defense or part thereof, the Moving Separate Statement must: (a) identify the relevant elements or issues; (b) list the asserted material facts establishing those elements or issues; and (c) cite to record evidence demonstrating that the asserted material facts are undisputed (e.g., deposition testimony, declaration or discovery response)."

A party cannot create a "genuine" dispute of "material" fact simply by making assertions in its legal memoranda, or, conversely, cannot argue that there are no disputed material facts, simply by so arguing in a memorandum. *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co.,* 690 F.2d 1235, 1238 (9th Cir. 1980). The Court should strike from consideration and disregard Euler's purported "facts" in Defendant's memorandum that are not included in the separate statement.

**Objection No. 2**: Euler's Motion includes citations to deposition testimony that is not set forth in their Separate Statement. Motion 9:18-10:2, Euler's citation to "Fiertz Dep. Tr. 108:12-

12" is not included in its Separate Statement. Motion 28:2-18, Euler's citation to "J. Fitzgerald Dep. Tr. 119:17-120:5 is not included in its Separate Statement.

**Objection No. 3**: Federal Rules of Civil Procedure ("FRCP") 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out *facts* that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." [Emphasis added].

The Declaration of Andrew P. Saulitis ("Saulitis Dec.), Paragraph 6, is void of facts, and is only to provide more argument in excess of the page limits for argument. Saulitis paragraph 6 is inadmissible argument under FRCP 56(c)(4), and the Court's Order.

**Objection No. 4**: Saulitis Dec. ¶ 10 asserts that "there is no dispute" and "Marble Bridge has finally conceded" that there is no coverage. Marble Bridge has not conceded the coverage issue. Saulitis ¶ 10 is argument and should be stricken pursuant to FRCP 56(c)(4), and the Court's Order.

**Objection No. 5**: Saulitis Dec. ¶¶ 14, 15, 18, 19 consist of impermissible argument, are void of facts, and should accordingly be stricken and disregarded by the Court. FRCP 56(c)(4), and the Court's Order.

**Objection No. 6:** The Saulitis Dec. contains *18* separate and distinct footnotes, which are argument and serve the intended purpose of expanding Defendant's argument in excess of the page limit requirements in the Court's Order for the Defendant's memorandum. Such footnotes should be stricken by the Court pursuant to FRCP 56(c)(4), and the Court's Order.

**Objection No. 7:** The Court's Order section IV.B.(1) is the format to be followed within the Court's page limitations. Moving party has violated the Order by inserting footnoted evidence that expands the statement beyond the page limits and prejudices the responding party's ability to provide material disputes while complying with the Court's Orders.

## IV.
## CONCLUSION

Construing the evidence in the light most favorable to Marble Bridge, there exist genuine disputes of material fact as to each of the claims set forth in Marble Bridge's First Amended Complaint. Euler's Motion for Summary Judgment should accordingly be denied.

Dated: June 16, 2015

LAW OFFICES OF VINCENT P. HURLEY
A Professional Corporation

By: /s/ Ryan M. Thompson
RYAN M. THOMPSON
Attorneys for Plaintiff/Counter-Defendant
MARBLE BRIDGE FUNDING GROUP, INC.