Renée C. Callantine (State Bar No. 155991)
RCallantine@cornerlaw.com
CORNERSTONE LAW GROUP
575 Market Street, Suite 3050
San Francisco, CA 94105
(415) 230-8737; (415) 974-6433 (Fax)

Neal W. Cohen
Andrew P. Saulitis
ncohen@halperinlaw.net
apslaw@msn.com
HALPERIN BATTAGLIA BENZIJA, LLP
40 Wall Street, 37th Floor
New York, NY 10005
(212) 765-9100; (212) 765-0964 (Fax)
Admitted *Pro Hac Vice*

*Attorneys for Defendant Euler Hermes American Credit Indemnity Company n/k/a Euler Hermes North America Insurance Company*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MARBLE BRIDGE FUNDING GROUP,<br><br>Plaintiff,<br><br>v.<br><br>EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY,<br><br>Defendant. | Case No. CV 12-02729 EJD<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>MARBLE BRIDGE FUNDING GROUP; NATURE'S OWN PHARMACY, LLC; RICHARD WALLACE; et al.,<br><br>Third-Party Defendants. | Hearing Date and Time:<br>July 2, 2015 at 9:00 a.m.<br>Hon. Edward J. Davila<br>Courtroom 4 – 5th Floor<br>San Jose Courthouse |

# TABLE OF CONTENTS

TABLE OF AUTHORITY ........................................................................................ iii-vi

ARGUMENT IN REPLY ........................................................................................ 5

I. MARBLE BRIDGE'S FAILURE TO MEET ITS EVIDENTIARY BURDEN ..... 5

II. MARBLE BRIDGE'S CONTRACTUAL/POLICY CLAIMS FAIL ..................... 8

III. MARBLE BRIDGE'S TORT CLAIMS FAIL ..................................................... 12

A. Breach of Implied Covenant of Good Faith and Fair Dealing .................. 12

B. Unfair Competition Under UCL .............................................................. 12

C. Aiding and Abetting Fraud ..................................................................... 13

D. Intentional Misrepresentation/Concealment ............................................. 16

E. Negligent Misrepresentation ..................................................................... 18

F. RICO Claims (No Leave Granted) ........................................................... 19

CONCLUSION ........................................................................................................ 24

CORNERSTONE LAW GROUP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Network, Inc. v Peerless Ins. Co.*, 190 Cal App 4th 1054, 119 Cal. Rptr. 3d 17 (2010) .......... 11

*Aguilera v. Pirelli Armstrong Tire Co.*, 223 F.3d 1010 (9th Cir. 2000) .......... 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 .......... 6, 7

*Benedict v. Hewlett-Packard Co.*, No.: 13-CV-00119-LHK, 2014 U.S. Dist. LEXIS 7331 .......... 10

*Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 14 Cal. Rptr. 3d 302 (2004) .......... 10

*Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001) .......... 7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .......... 5, 6, 7

*Chase v. Blue Cross of Calif.*, 42 Cal. App. 4th 1142, 50 Cal. Rptr. 2d 178 (1996) .......... 11

*Chaset v. Fleer/Skybox Int'l, L.P.*, 300 F.3d 1083 (9th Cir. 2002) .......... 20

*Chateau Chamberay, Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335 (2001) .......... 12

*Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855 (N.D. Cal. 2011) .......... 10

*Factor King, LLC v. Euler Hermes N. Am. Ins. Co.*, No. 11-15978 (N.Y. Sup. Ct. Suffolk Cnty. filed May 18, 2011) .......... 14

*Factor King, LLC v. US Hay Direct LLC*, No. 10-2512-CAG (Cir. Ct. 5th Jud. Cir. Marion Cnty. Fla. filed May 26, 2010) .......... 14

*Estate of Gonzales v. Hickman*, ED CV 05-660 MMM, 2007 U.S. Dist. LEXIS 84050, 2007 WL 3237727 (C.D. Cal. May 30, 2007) .......... 6

*Guidry v. United States DOI*, No.: 12-cv-5639 JSC, 2014 U.S. Dist. LEXIS 24787 (N.D. Cal. Feb. 26, 2014) .......... 10

*Henry v. Lehman Comm'l Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977 (9th Cir. 2006) .......... 15, 16

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) .......... 7

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003) .......... 12

*Manneck v. Lawyers Title Ins. Corp.* 28 Cal.App.4th 1294 (1994) .......... 11

*Marketel Int'l v Priceline.com*, 138 F Supp. 2d 1210 (N.D. Cal. 2001) .......... 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .......... 6

*Nelson v. Pima Community College*, 83 F.3d 1075 (9th Cir. 1996) .......... 6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc*., 210 F.3d 1099 (9th Cir. 2000) .......... 7, 22

*Odom v. Microsoft Corp*., 486 F.3d 541 (9th Cir. 2007) .......... 20

*Pacific. Gas & Elec. Co. v. Howard P. Foley Co*., No. 94-16162, 1996 U.S. App. LEXIS 6522 (9th Cir. March 6, 1996) .......... 20

*Patent Scaffolding Co. v. William Simpson Constr. Co*., 256 Cal. App. 2d 506, 64 Cal. Rptr. 187 (Cal. Ct. App. 1967) .......... 10

*Quan v. San Francisco Police Dep't*, No. C 10-01835 MEJ, 2012 U.S. Dist. LEXIS 139530 (N.D. Cal. Sept. 27, 2012) .......... 20

*R & B Auto Ctr., Inc. v. Farmers Group, Inc*., 140 Cal. App. 4th 327, 44 Cal. Rptr. 3d 426 (2006) .......... 11, 22

*Reves v. Ernst & Young*, No. 91-886, slip op., 507 U.S. 170, 113 S. Ct. 116, 122 L. Ed. 2d 525 (1993) .......... 20

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2011) .......... 19

*Ruiz v. Gap Inc*., 622 F.Supp.2d 908 (N.D. Cal. 2009), *aff'd*, 380 Fed.Appx. 689, 2010 U.S. App. LEXIS 10984 (9th Cir. May 28, 2010) .......... 10

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc*., 806 F.2d 1393 (9th Cir. 1986) .......... 20, 21

*Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978 (9th Cir. 2007) .......... 6

*Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) .......... 7

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) .......... 7

*Toguchi v. Chung*, 391 F.3d 1051 (9th Cir 2004) .......... 6

*Tri-Dam v. Schediwy*, No.1:11-CV-01141 AWI-SMS, 2011 U.S. Dist. LEXIS 146789, 2011 WL 6692587 (E.D. Cal. Dec. 21, 2011) .......... 7

*United States v. Turkette*, 452 U.S. 576, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) .......... 20

CORNERSTONE LAW GROUP

*Upasani v. State Farm Gen'l Ins. Co.*, 227 Cal. App. 4th 509 (2014) ........ 13

*Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619 (Cal. 1995) ........ 12

*Wilson v. Century 21 Great Western Realty*, 15 Cal. App. 4th 298, 18 Cal. Rptr. 2d 779 (1993) ........ 18, 19

*Zhang v. Superior Court*, 57 Cal. 4th 364, 304 P.3d 163, 159 Cal. Rptr. 3d 672 (2013) ........ 12

**Statutes and Rules**

18 U.S.C. §1341 ........ 21

18 U.S.C. § 1961(4) ........ 20

18 U.S.C. § 1962(c) ........ 19, 20

18 U.S.C. § 1962(d) ........ 19

California Business & Professions Code §17200 ........ 2, 12

Fed. R. Civ. P. 56 ........ 1, 5, 6

CORNERSTONE LAW GROUP

This memorandum is submitted on behalf of defendant Euler Hermes American Credit Indemnity Company ("Euler") in further support of its motion pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the amended complaint of plaintiff Marble Bridge Funding Group, Inc. ("Marble Bridge") (Dkt. No. 176).

Marble Bridge's opposition to summary judgment is a lengthy catalog of non-issues. It only distracts from Marble Bridge's manifest failure to present admissible evidence supporting essential elements of all of its claims, which we outlined at the outset of this motion.[1] Ignoring its task as the party with the burden of proof to present such

[1][T]he following outlines the elements of such claims (see Memorandum of Points and Authorities) for which there is no admissible evidence sufficient to sustain a directed verdict in Marble Bridge's favor:

(a) Aiding And Abetting Fraud" (First Claim, Am. Compl. ¶¶ 104-113) (Ex. A):

i. There is no evidence of actual knowledge by Euler that Nature's Own was creating fictitious invoices for sale to factors.

ii. There is no evidence of actual knowledge by Euler that Nature's Own was commonly controlled with other companies involved with fraud.

iii. There is no evidence of actual knowledge by Euler that Anette Zimmerman was a false identity for Marsha Kay Holloway.

iv. There is no evidence of substantial assistance by Euler in Nature's Own fraud.

v. There is no evidence that Euler reached a conscious decision to participate in tortious activity for the purpose of assisting Nature's Own in performing a wrongful act

(b) "Fraud and Deceit – Intentional Misrepresentation/Civil Code Sections 1709 et seq., 1572, 3294" (Second Claim, Am. Compl. ¶¶ 114-123) (Ex. A):

i. There is no evidence that Euler misrepresents material facts to Marble Bridge.

ii. There is no evidence that any representations were made with knowledge of their falsity.

iii. There is no evidence of intent to defraud.

iv. There is no evidence of justifiable reliance by Marble Bridge.



CORNERSTONE LAW GROUP

(c) "Fraud and Deceit – Fraudulent Concealment/Civil Code Sections 1709 et seq., 1572, 3294" ) (Third Claim, Am. Compl. ¶¶ 124-139) (Ex. A):

i. There is no evidence that Euler concealed or suppressed a material fact to Marble Bridge.

ii. There is no evidence that Euler was under a duty to disclose any such the fact to Marble Bridge.

iii. There is no evidence that Euler intentionally concealed or suppressed any such fact with the intent to defraud Marble Bridge.

iv. There is no evidence that Marble Bridge was unaware of the facts and would not have acted as it did if he had known of the concealed or suppressed fact.

v. There is no evidence that as a result of the concealment or suppression of the fact, Marble Bridge sustained damage caused thereby.

(d) "Negligent Misrepresentation/Civil Code Sections 1709 *et seq.*, 1573" ) (Fourth Claim, Am. Compl. ¶¶ 140-149) (Ex. A):

i. There is no evidence of a misrepresentation of a past or existing material fact.

ii. There is no evidence that any representation was without reasonable grounds for believing it to be true.

iii. There is no evidence of any such misrepresentation with intent to induce Marble Bridge's reliance on the fact misrepresented.

iv. There is no evidence of Marble Bridge's ignorance of the truth and justifiable reliance thereon.

v. There is no evidence of damages cause by the above.

(e) "Breach of the Implied Covenant of Good Faith and Fair Dealing" (Seventh Claim, Am. Compl. ¶¶ 172-188) (Ex. A):

i. There is no evidence of coverage or unreasonable basis for denial of coverage.

(f) "Unfair Competition [under California Business & Professions Code section 17200]" (Eighth Claim, Am. Compl. ¶¶ 189-192) (Ex. A):

i. There is no evidence that Euler's coverage position was unreasonable, illegal, unfair, or fraudulent.

ii. There is no evidence that Euler received anything from Marble Bridge for which there could be restitution.



CORNERSTONE LAW GROUP

evidence, Marble Bridge does little to go beyond its pleadings, and thus fails to overcome summary judgment under the regime of Fed. R. Civ. P. 56 (e), whereby, under Fed. R. Civ. P. 56 (e) (3), the Court should grant summary judgment as "the motion and supporting materials — including the facts considered undisputed — show that the movant [Euler] is entitled to it."

As shown by Euler's Moving Separate Statement and Responding Separate Statement, most of the facts presented are either undisputed entirely or are nominally "disputed" without real evidence supporting any contrary facts or with reference to extraneous facts not material.

Though immaterial, most of the opposition involves matters post-January 2012, after Marble Bridge had already purchased the invoices from Nature's Own that comprised its insurance claim.[2] Nothing that happened or that was said or not said after January 13 (or even January 20), 2012 was or could be material to any of Marble Bridge's

---

iii. There is no evidence of any injunctive relief to which Marble Bridge would or could be entitled.

Saulitis Decl. ¶ 15 (Dkt. No. 220).

[2]For example, Marble Bridge dwells upon "Euler Hermes' action of increasing a number of credit limits on the buyers on Policy Two in January 2012" (Candau Decl. ¶ 21), upon having "[o]n February 27, 2012 . . . received notice that five buyers/debtors credit limits under Policy Two had been canceled" (Candau Decl. ¶ 22), upon having "[o]n February 27 or 28, 2012 . . . talked to Euler agent John Fitzgerald by telephone to ask why the credit limits on five buyers were canceled" and having been told "that he did not know why the five credit limits were canceled, but he would get back to me" (Candau Decl. ¶ 24), upon having received a copy of a letter dated March 6, 2012 "offering to rescind Policy Two" (Candau Decl. ¶ 28), upon having "discovered via the Euler computer network that Euler had canceled additional credit limits on buyers on Policy Two" between February 27, 2012 and March 6, 2012 (Candau Decl. ¶ 29), upon having "had no conversations with anyone from Euler Hermes between February 28, 2012, and March 7, 2012" (Candau Decl. ¶ 30), upon having "called Euler claims person Linda Clash and le[aving] a message" and "not receiv[ing] a return phone call" after having filed its claim (Candau Decl. ¶ 43), upon having, on April 9, 2012, "called Ms. Clash" who "refused to talk to me and told me to call Euler attorney Deborah Stuehrmann" (Candau Decl. ¶ 43), upon having, on April 9, 2012, "called Deborah Stuehrmann who took my call but declined to give me any information and sa[ying] she would get back to us shortly" (Candau Decl. ¶ 43), upon having on April 12, April 24 and April 26, 2012, "called and left messages with Ms. Stuehrmann," who "either failed to take my call, refused to return my call, or refused to give me any information" (Candau Decl. ¶ 43) and "[o]ther Marble Bridge personnel" having "called Euler Hermes corporate offices as a follow-up to the Marble Bridge claims submitted to Euler Hermes" but that "no one would give us any information" (Candau Decl. ¶ 44).



CORNERSTONE LAW GROUP

claims because after that time frame, Marble Bridge had already decided to stop funding Nature's Own and purchased no more invoices from it. See Fact 44 (undisputed that there was no subsequent funding.[3] Candau Dep. Tr. 122:11-14, 123:7-10 (testifying that Marble Bridge had stopped purchasing invoices from Nature's Own as of January 13, 2012) (Ex. E).

Marble Bridge dwells on these irrelevant matters because it is desperate to garner support for its theory, which is the linchpin of its claims, indeed all of them, that "Euler knew" that Nature's Own's invoices were fraudulent, and purported to "insure" them anyway in order to collect premiums. Marble Bridge has failed to offer any evidence that Euler possessed any such actual knowledge, and has not moved its case beyond speculation.

What about matters pre-January 2012? Marble Bridge grasps at snippets from "marketing materials" dating back to 2006, describing Euler's methodology in underwriting credit risks for its policies. But it turned out that credit risks never came into play, as invoices Marble Bridge had purchased under its Receivables Purchase Agreement with Nature's Own were simply falsified pieces of paper that did not involve credit risks at all, nor anything that could be covered under any credit insurance policy. Indeed Marble Bridge itself concedes, as it must, that there is no basis for coverage under the Policy, given the lack of **Shipments** of **Covered Products.** MBFG Supp. Resp. to Euler Interrogs. (Ex. J) ¶ 1 ("does MARBLE BRIDGE contend that there were actual '**Covered**

[3]Marble Bridge's Paul Candau declares that "[o]n January 20, 2012, Marble Bridge purchased invoices from Nature's Own" but "[b]ased on my suspicions regarding Nature's Own at that time, Marble Bridge *did not forward the money to Nature's Own*, but instead put the money into Nature's Own's reserve account." Candau Decl., June 16, 2015 (Dkt. No. 230-2) ¶ 16 (emphasis added). This actually is a reference to a "Specific Reserve Account" pursuant to the Receivables Purchase Agreement between Marble Bridge and Nature's Own (RPA), to which "the right, title and interest in which shall belong to MBFG" and Marble Bridge being authorized thereunder "to charge and set-off against the Specific Reserve Account any amounts due MBFG hereunder at any time, without prior notice to [Nature's Own]." RPA §§ 1 (p. 3) & 12 (Case 5:12-cv-01839-EJD Dkt. No. 1-1). Since no money went to Nature's Own, no such purchase was consummated, though this is not a material fact, since Marble Bridge did do any act after January 13 or 20, 2012 in reliance on the Policy nor suffer any damages on account of any advances made to Nature's Own after either date.



CORNERSTONE LAW GROUP

CORNERSTONE LAW GROUP

**Products**' in existence? . . . No."), ¶ 2 ("does MARBLE BRIDGE contend that there were actual '**Shipments**' of **Covered Products**? . . . No."), ¶ 4 ("Does MARBLE BRIDGE contend that any of the INVOICES were *bona fide*, *i.e.*, representing actual sales and deliveries of actual goods upon agreed credit terms? . . . No."). Indeed Marble Bridge itself contends that the invoices it filed in support of its claim were *fraudulent*. MB Supp. Resp. to Euler Interrogs. (Ex. J) ¶ 3 ("Does MARBLE BRIDGE contend that the INVOICES were fraudulent? . . . Yes.").

But despite no coverage, is there nevertheless a basis for a misrepresentation claim (or any other tort claim)? No. There is simply no evidence to support the essential elements of any such claim, as further discussed below.

## ARGUMENT IN REPLY

### I. MARBLE BRIDGE'S FAILURE TO MEET ITS EVIDENTIARY BURDEN

Euler's is a "no evidence" motion.

> [A] defendant moving for summary judgment on the ground that plaintiffs have no evidence to support their claims has no burden of production at all. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)] ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. On the contrary, Rule 56(c), which refers to 'the affidavits, if any' (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment 'with or without supporting affidavits' (emphasis added)"); *id*. at 324 ("[A] motion for summary judgment may be made pursuant to Rule 56 'with or without supporting affidavits.' In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not

> accompanied by affidavits, will be 'made and supported as provided in this rule,' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'"). In other words, under Rule 56, a defendant is not required to prove a negative -- *i.e.*, the absence of genuine issues of material fact -- to establish his or her entitlement to summary judgment. Rather, the party may simply assert that there is no evidence to substantiate the material allegations of the complaint. To defeat the motion, plaintiffs must adduce evidence contradicting defendant's claim.

*Estate of Gonzales v. Hickman*, ED CV 05-660 MMM (RCx), 2007 U.S. Dist. LEXIS 84050, *38-40, 2007 WL 3237727 (C.D. Cal. May 30, 2007); *Marketel Int'l v Priceline.com*, 138 F Supp. 2d 1210, 1214 (N.D. Cal. 2001) (on summary judgment, "defendants are not obliged to offer evidence to prove a negative") (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325 ("The burden on the moving party may be discharged by 'showing' - that is by pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."); *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). Euler has done this, showing the absence of evidence to support Marble Bridge's case in myriad respects. Saulitis Decl. ¶ 15 (Dkt. No. 220) (n.1 above).

With Euler having met its initial burden, Marble Bridge must in turn set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202, 213(1986); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d at 984; *see also* FRCP 56(c), (e). Such evidence must be more than "merely colorable" but must be "significantly probative," *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 249-50, and the opponent "must do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Mere . . . speculation [does] not create a factual dispute for

purposes of summary judgment.'" *Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir 2004) (quoting *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)).

Marble Bridge may not rest, as it does, upon mere allegations or denials of Euler's evidence, but instead must produce admissible evidence showing there is a genuine dispute of material fact for trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

And it is not a court's task "to scour the record in search of a genuine issue of triable fact" but is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."); *Tri-Dam v. Schediwy*, No.1:11-CV-01141 AWI-SMS, 2011 U.S. Dist. LEXIS 146789, *10, 2011 WL 6692587 (E.D. Cal. Dec. 21, 2011) ("the Court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references") (citing *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) and *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d at 1031).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. at 323.

A fact is "material" only if it could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 ("As to materiality, the substantive law will identify which facts are material. Only disputes over



CORNERSTONE LAW GROUP

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.”).

Marble Bridge posits many would-be “facts,” though few with any real evidentiary support, and none to deter summary judgment.

## II. MARBLE BRIDGE’S CONTRACTUAL/POLICY CLAIMS FAIL

Marble Bridge argues that “Policy One and Policy Two were, in fact, separate and distinct policies.” Opp. Mem. at 19. What then is the difference? Marble Bridge argues that the Policy here is actually two “separate and distinct policies” because the original and renewal policies have different “Policy Numbers” (5033862 and 5041669) and different “policy periods” (from November 1, 2010 through October 31, 2011 and from November 1, 2011 through October 31, 2012). Declaration of John F. Fitzgerald dated June 16, 2015 (Dkt. No. 230-1) ¶¶ 7-9; *see also* Declaration of Paul Candau dated June 16, 2015 (Dkt. No. 230-2) ¶¶ 6-9. But there is no other difference, and the terms and conditions are virtually identical. *See* Policy (Stuehrmann Decl. Ex. D) and Marble Bridge does not cite any other difference, nor indicate how one policy versus two makes any difference in this action.

Moreover, the original policy (No. 5033862) provides: “It is agreed that this Policy shall continue for subsequent **Policy Periods**[4] as follows. At the end of the first or any subsequent **Policy Period**, this Policy shall be automatically renewed for an additional like period of time unless this Policy is cancelled either by you or us, in writing, at least sixty (60) days prior to the renewal date.” Policy Form I. E. (Stuehrmann Decl. Ex. D). The Policy further provides that “It is agreed that upon expiration of this Policy, all **Credit Limits** in effect will be transferred to and become effective in any **Renewal Policy**

[4] “**Renewal Policy**” is defined in the Policy as “a Policy we issue to you which provides continuous coverage for another Policy Period in exchange for your payment of Premium. The terms of any **Renewal Policy** may be different from the terms in this Policy.” Policy Form XI (DEFINITIONS) 30 (Stuehrmann Decl. Ex. D).

CORNERSTONE LAW GROUP

unless there is a gap between the date on which this Policy expires and a Renewal Policy goes into effect, in which case no limits from this Policy will be transferred to and become effective in any Renewal Policy and only **Credit Limit(s)** endorsed to such **Renewal Policy** will be in effect under such Renewal Policy." Domestic Policy Amendment Endorsement No. 75465 to Policy No. 5033862 (Stuehrmann Decl. Ex. D). In the "RENEWAL FORM" (application) dated October 24, 2011, Nature's Own represented that there were no changes in its "Credit Management Procedures," "Product lines and/or service offerings," "Business practices" or "Standard terms of sale," and Marble Bridge remained a policy beneficiary. *Compare* Bank/Lender Policy Beneficiary Endorsement No. 75306 to Policy No. 5033862 *with* Bank/Lender Policy Beneficiary Endorsement No. 75306 to Policy No. 5041669. Stuehrmann Decl. Ex. D.

In any event, Marble Bridge's designated expert on credit insurance, Carey D. Fiertz (who is not heard from on this motion), has confirmed non-coverage under any policy, without any distinction between the original and "renewal" policy. Fiertz Dep. Tr. 48:5-22 (Ex. F) ("Based on information I've been given, I am of . . . the opinion there would be no coverage under the policy for Marble Bridge's claim" and "to a reasonable degree of certainty in the field of trade credit insurance that Euler may not be liable under the terms of the policy for Marble Bridge' claim"). Marble Bridge now concedes this. Opp. Mem. at 19, 22 ("Marble Bridge is not seeking . . . coverage of risks not covered by the terms of either Policy").

But Marble Bridge doggedly argues that "[i]rrespective of the coverage issue, Euler nevertheless breached Policy Two by failing to provide written notice to Marble Bridge regarding each and every credit cancellation." Opp. Mem. at 19. There is no genuine issue here. Marble Bridge's president has conceded that "we were provided notice that Euler cancelled some of the credit limits somewhere in that time frame [February 27, 2012]." Candau Dep. Tr. 103:1-6 (Ex. E) and further that "[b]etween February 27, 2012, and March 6, 2012, we discovered via the Euler computer network that Euler had canceled

CORNERSTONE LAW GROUP

additional credit limits on buyers on Policy Two." Candau Decl. June 16, 2015 ¶ 29. Marble Bridge had been accorded access to Euler's computer system (called "EOLIS"--Euler On-Line Information System) whereby it had direct access to **Credit Limits** on all **Buyers** under the Policy. Mooney Dep. Tr. 61:17-63:17 (testifying that Marble Bridge could learn from EOLIS access the "the credit limits of the debtors" *i.e.* "the dollar amount that Euler would cover in case of a loss on each debtor" including "any changes as far as increases."). And assuming arguendo that there had been no notice of cancellation, that would simply mean that Euler's cancellation of **Credit Limits** would be ineffective as to any **Shipments** of **Covered Products** occurring subsequently, *of which there were none*.

This is immaterial in any event as Marble Bridge incurred no damages after Euler cancelled "**Credit Limits**" (as it had the right to do) on February 27 and 28, 2012, *after* Marble Bridge *already* had stopped purchasing invoices from Nature's Own well before that (as of January 13, 2012). Candau Dep. Tr. 122:11-14, 123:7-10 (Ex. E). "A breach of contract without damage is not actionable." *Patent Scaffolding Co. v. William Simpson Constr. Co*., 256 Cal. App. 2d 506, 511, 64 Cal. Rptr. 187 (Cal. Ct. App. 1967). Nominal damages, speculative harm, or threat of future harm do not suffice to show legally cognizable injury. *See Aguilera v. Pirelli Armstrong Tire Co*., 223 F.3d 1010, 1015 (9th Cir. 2000*); see also Ruiz v. Gap Inc*., 622 F.Supp.2d 908, 917 (N.D. Cal. 2009), *aff'd*, 380 Fed.Appx. 689, 691, 2010 U.S. App. LEXIS 10984, *5-6 (9th Cir. May 28, 2010) (affirming summary judgment dismissing contract claims because plaintiff "had failed to adduce any evidence of the appreciable and actual damage necessary to sustain a contract claim under California law"); *Benedict v. Hewlett-Packard Co*., No.: 13-CV-00119-LHK, 2014 U.S. Dist. LEXIS 7331, *16-17; 2014 WL 234218 (N.D. Cal. Jan. 21, 2014); *Guidry v. United States DOI*, No.: 12-cv-5639 JSC, 2014 U.S. Dist. LEXIS 24787, *6-7 (N.D. Cal. Feb. 26, 2014) ("damages element" is "a necessary element of a breach of contract claim") (citing *Patent Scaffolding Co. v. William Simpson Constr. Co*., 256 Cal. App. 2d



CORNERSTONE LAW GROUP

at 511 and *Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 473, 14 Cal. Rptr. 3d 302 (2004)); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 864-65 (N.D. Cal. 2011). There remains no evidence that Marble Bridge sustained any damages on account of any failure to receive notice of cancellation of **Credit Limits**.

Marble Bridge also argues that Euler should be "estopped . . . from denying Marble Bridge coverage." Opp. Mem. at 22. It relies on *Chase v. Blue Cross of Calif.*, 42 Cal. App. 4th 1142, 1157, 50 Cal. Rptr. 2d 178 (1996). The linchpin of its argument is that "Euler knew Nature's Own and the Nature's Own buyers were fraudulent, and maintained/granted credit limits in order to continue receiving premiums under the policy." Opp. Mem. at 23. But there remains no evidence that Euler actually had such knowledge, so even if its "estoppel" theory had validity, it would be unsustainable for failure of proof.

But, in any event, "estoppel" does not apply to *expand* coverage under an insurance policy. *Advanced Network, Inc. v Peerless Ins. Co.*, 190 Cal App 4th 1054, 1067 n.4, 119 Cal. Rptr. 3d 17, 28 n.4 (2010) (distinguishing *Chase v. Blue Cross* as "this case concerns the claimed expansion of coverage rather than the forfeiture of a right under the policy").

*R & B Auto Ctr., Inc. v. Farmers Group, Inc.*, 140 Cal. App. 4th 327, 352, 44 Cal. Rptr. 3d 426, 447 (2006), points out the distinction Marble Bridge would ignore:

> The case before us, however, does not involve the forfeiture of a contractual right under the policy. Rather, it involves the use of the theories of waiver and estoppel to create coverage where none otherwise exists—that is, to create an otherwise nonexistent written contract providing lemon law coverage for used car sales, in order to use the newly created contract as the basis for a claim of breach. The distinction is key.
>
> "'"'The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom ….'"' [Citation.]" (*Manneck v.*



CORNERSTONE LAW GROUP

> *Lawyers Title Ins. Corp.* (1994) 28 Cal.App.4th 1294, 1303 [33 Cal. Rptr. 2d 771].)

*Id*., 140 Cal. App. 4th at 352, 44 Cal. Rptr. 3d 426, 447.

Marble Bridge's "contractual" claims thus fail.

## III. MARBLE BRIDGE'S TORT CLAIMS FAIL

### A. Breach of Implied Covenant of Good Faith and Fair Dealing

Marble Bridge concedes that "[i]n order to state a claim for breach of the implied covenant [of good faith and fair dealing], there must be a breach of the underlying policy." Opp. Mem. at 25. Given that there is no coverage and no viable claim for breach of the Policy, Marble Bridge's Seventh Claim, for "Breach of the Implied Covenant of Good Faith and Fair Dealing" (Am. Compl. ¶¶ 172-188) (Ex. A), must likewise fail. *E.g.*, *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995); *Chateau Chamberay, Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co*., 90 Cal. App. 4th 335 (2001).

### B. Unfair Competition Under UCL

Marble Bridge persists in its claim for violation of Section 17200 of the California Business and Professions Code (Unfair Competition Law ("UCL") (Eighth Claim) (Ex. A), though acknowledging that "there is no private cause of action for damages" under the UCL and that "suits under the UCL are limited to injunctive relief and restitution." Opp. Mem. at 28 (citing *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal.4th 1134, 1144 (2003)); *see also Zhang v. Superior Court*, 57 Cal. 4th 364, 371, 304 P.3d 163, 167-68, 159 Cal. Rptr. 3d 672, 678 (2013). Marble Bridge paid no premium (or any money) to Euler, so there is no basis for "restitution" of anything. *See* MBFG Additional Fact F ("It is undisputed that *Nature's Own* paid premiums to Euler in accord with Policy One and Policy Two") (emphasis added). There is no claim for injunctive relief. *See* Am. Compl. (Ex. A). Thus there is no basis for a claim under the UCL, nor is any viable claim established regardless of relief sought, as previously discussed and left unaddressed by

Marble Bridge.

Marble Bridge makes vague reference to "numerous misleading statements in advertising to Marble Bridge, endorsing the credit worthiness of its insured companies." Opp. Mem. at 30. But no such "endorsement" is actually presented. (The "advertising" referred to dates back to 2006 and is incomplete.[5] Marble Bridge excerpts various things in marketing materials, but does not show, let alone offer evidence, as to how any of those things was inaccurate or misleading. Nor did creditworthiness make any difference, as the losses were caused by fraud, a loss not insurable by any policy no matter how advertised.

**C. Aiding and Abetting Fraud**

Marble Bridge persists in its "Aiding And Abetting Fraud" (Am. Compl. ¶¶ 104-113), while acknowledging that "liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted" (Opp. Mem. At 3 (citing *Upasani v. State Farm Gen'l Ins. Co.*, 227 Cal. App. 4th 509, 519 (2014)) but not offering any evidence that Euler had such actual knowledge or that Euler knew that Nature's Own was "committing a specific tort."

Instead, Marble Bridge refers to "Marsha Kay Holloway" and things she allegedly did with U.S. Hay Direct, LLC and other entities that she allegedly controlled. Opp. Mem. At 5-10. But nowhere does Marble Bridge point to any evidence, let alone admissible evidence, that Euler had any actual knowledge that "Anette Zimmerman" (the account

[5]Marble Bridge has failed to present any evidence: (a) that anyone from MBFG actually read let alone relied upon marketing materials, (b) that anything in any such marketing materials is a material misrepresentation or (c) was provided by Euler to Marble Bridge with the intent to deceive it. Marble Bridge attaches snippets of various Euler marketing materials as Hurley Ex. BB, which is incomplete. Omitted is transmittal email dated June 22, 2006 (MBFG 002960) from Euler's John Fitzgerald to Marble Bridge's Andrew Krone stating "here is general info we typically email to a prospect. Let me know if you need anything else on Duty Free," showing that materials were provided four years before the Nature's Own Policy, regarding another insured, Duty Free Golf. MBFG fails to include the full documents, *e.g.*, it includes only one page (EULER HERMES-CONFIDENTIAL 004623) from a May 14, 2009 brochure specifically provided to and prepared for STC Capital Bank (EULER HERMES-CONFIDENTIAL 004617-4626) but leaves out the parts stating that "[Credit] Insurance *is not a substitute for a sound credit management process*" and doesn't eliminate the need for a credit department and that "Business Credit Insurance" is "*Part* of Sound Risk Management Strategy." EULER HERMES-CONFIDENTIAL 004619, 004621 (emphasis added).



CORNERSTONE LAW GROUP

CORNERSTONE LAW GROUP

manager of Nature's Own) was actually a fictitious identity for the person of Holloway, or that Nature's Own was actually affiliated (through Holloway) with other entities and insureds. Marble Bridge also has failed to point to any evidence that Euler actually knew that Nature's Own was "committing a specific tort," here, fabricating invoices and selling them to Marble Bridge to obtain funding. Marble Bridge has not taken this issue past the "conspiracy theory" stage.

And Marble Bridge references another factor, Factor King, LLC, a beneficiary under a different policy are simply misleading. As a matter of public record, in pending litigation, Factor King has never claimed fraud or that U.S. Hay Direct, LLC was a "fake company"; rather, it has asserted that such company and its transactions were bona fide. *See Factor King, LLC v. Euler Hermes N. Am. Ins. Co.*, No. 11-15978 (N.Y. Sup. Ct. Suffolk Cnty. filed May 18, 2011), *see also Factor King, LLC v. US Hay Direct LLC*, No. 10-2512-CAG (Cir. Ct. 5th Jud. Cir. Marion Cnty. Fla. filed May 26, 2010). It its beyond comprehension how Marble Bridge can reference a "$500,000.00 claim from Factor King" as evidence that it had "purchased invoices of a Euler-insured fake company, U.S. Hay Direct" (Opp. Mem. at 5) let alone that Euler knew this or that Euler knew that U.S. Hay Direct, LLC and Nature's Own were affiliated and involved in a common fake-invoice scheme.

To bolster its moribund "Euler knew" theory, Marble Bridge blurs the time line of this action. It is undisputed that in mid-February 2012, Euler started having misgivings about Nature's Own and some of its **Buyers**, *see* Stuehrmann Decl. ¶¶ 11-18, leading to cancellation of **Credit Limits**, and eventually, actual discovery of fraudulent activity, albeit after this case was commenced. However, what Euler did or didn't know in February 2012 or later is immaterial to Marble Bridge's misrepresentation (or aiding and abetting) claims because Marble Bridge admittedly had already stopped purchasing invoices from or funding Nature's Own, and sustained no loss on account of anything Euler allegedly "knew" after that time. Fact 44 ("On January 13, 2012, Marble Bridge

stopped buying invoices from Nature's Own and ceased all funding. Candau Dep. Tr. 122:11-14, 123:7-10 ('last funding was January 13th, 2012, from Marble Bridge to Nature's Own'). Subsequent requests by Nature's Own for funding were refused. Candau Tr. 123:15-124:3.").[6]

Marble Bridge's legal authority is thin at best. It relies almost entirely on *Henry v. Lehman Comm'l Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 993 (9th Cir. 2006), a bankruptcy case in which the borrowers of the debtor (First Alliance, a subprime mortgage lender) sought to impose "aiding and abetting" liability on Lehman Brothers growing out of Lehman's activity as a lender and underwriter of First Alliance's securitized debt. There, the Court of Appeals upheld a jury verdict on aiding and abetting fraud where "[a]mong other evidence in the record, the Borrowers highlighted the facts that throughout its investigations into First Alliance, Lehman received reports that detailed the fraudulent practices in which First Alliance was engaged, and that in one report, a Lehman officer noted his concern that if First Alliance 'does not change its business practices, it will not survive scrutiny'" and "[t]hat same evaluation recounted that First Alliance 'does not have the clear-cut defenses that the management believes' and that 'at the very least, this is a violation of the spirit of the Truth in Lending Act.'" *Id.*, 471 F.3d at 994. *First Alliance* does not expand the law, and there is no comparison. Euler had no such dealings with nor investigation of Nature's Own, which succeeded in carrying on its mischief without detection, let alone actual knowledge. The case does not support in the least Marble Bridge's theory of attenuated knowledge on Euler's part, whereby alleged "knowledge" (actually just suspicion) of fraud on the part of other insureds translates into actual knowledge of Nature's Own's fraud. This is just another manifestation of Marble

[6]This is "disputed" only to the extent Marble Bridge claims to have "continued to purchase invoices from Nature's Own up to January 13, 2012, but put the money into Nature's Own's reserve account for the benefit of Nature's Own," but leaving out the fact that the "Reserve Account" was, under its Receivables Purchase Agreement with Nature's Own, "the right, title and interest in which shall belong to MBFG" and Marble Bridge was authorized "to charge and set-off against the Specific Reserve Account any amounts due MBFG . . . at any time, without prior notice to [Nature's Own]." RPA §§ 1 (p. 3) & 12 (Case 5:12-cv-01839-EJD Dkt. No. 1-1).



CORNERSTONE LAW GROUP

CORNERSTONE LAW GROUP

Bridge's attempt to transmogrify constructive knowledge, which is inapplicable, into actual knowledge, which is the *sine qua non* of an aiding and abetting claim. Indeed, if anything, *First Alliance* reaffirms that "Aiding and abetting fraud under California law requires a finding of 'actual knowledge.'" *Id.*, 471 F. 3d at 989.

**D. Intentional Misrepresentation/Concealment**

As for its claims for "Fraud and Deceit – Intentional Misrepresentation/Civil Code Sections 1709 *et seq*., 1572, 3294" (Second Claim, Am. Compl. ¶¶ 114-123) and "Fraud and Deceit – Fraudulent Concealment/Civil Code Sections 1709 *et seq*., 1572, 3294") (Third Claim, Am. Compl. ¶¶ 124-139), Marble Bridge relies on its "Euler knew" theory, and then asserts that Euler concealed what it supposedly knew from Marble Bridge. It does not advance any assertion that Euler made any affirmative misrepresentation, apparently having abandoned that theory, which has no evidentiary support in any event, let alone support for intent to deceive or any element.

So what does Marble Bridge now contend, in retreat, that Euler "fraudulently concealed"? This is laid out at pages 12-13 of its Opposing Memorandum, where nothing but speculation is offered, unsupported by any evidence: That supposedly "Euler knew of the Nature's Own fraud, and actively concealed such knowledge from Euler." No evidence is cited for that entirely conclusory proposition. That "Euler knew in September 2011 that US Hay Direct, Equipack LLC, Kay Holloway and Greg Winters were under criminal investigation by the Florida State Attorney General Office." No evidence is cited for any knowledge of what the investigation was about or how it pertained to Nature's Own (which it did not) or what connection there was between the people mentioned and any fraud against Marble Bridge. That "Euler knew, at the time Marble Bridge became a beneficiary under the Policy, that buyers on the Euler-Equipack policy (in which Gulf Coast was a beneficiary) included Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle." This says nothing of any fraud, let alone provides evidence of knowledge. That "Euler knew, at the time Marble Bridge became a beneficiary under the Policy, that

CORNERSTONE LAW GROUP

buyers on the Euler-U.S. Hay policy (in which Factor King was a beneficiary) included the same buyers, specifically Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle." This says nothing of any fraud, let alone provides evidence of knowledge. That "Euler knew that the buyers on the Euler-Nature's Own policy (in which Marble Bridge was a beneficiary) included Rancho Linda Marchadores, with Nature's Own serving as the Insured." This says nothing of any fraud, let alone provides evidence of knowledge. That "Euler also knew that Equipack LLC, under criminal investigation by Hanson, was a Nature's Own buyer." This says nothing of any fraud, let alone provides evidence of knowledge. That Euler supposedly knew that "International Air Cargo was a fraudulent company" and "via the Hanson phone call in September 2011 that Equipack was under criminal investigation, Euler continued to maintain and/or approve credit limits for International Air Cargo and Equipack." This remains speculation and provides no evidence of what Euler actually new.

Needless to say, speculation on top of speculation does not adds up to knowledge of any actual fraud, let alone knowledge that invoices that Marble Bridge was purchasing had been fabricated by Nature's Own, and selling them to Marble Bridge, just to enable Euler to collect premiums. It remains that there is no evidence to support any claim for fraudulent concealment, or any type of misrepresentation claim.

And Marble Bridge says nothing of its own expert's assessment of the entire case and his conclusion that nothing supports any assertion that any "representations or misrepresentations were made for the purpose of harming Marble Bridge" or that there was "any information in [his] review of everything in this case that [he had] seen that anyone inside of Euler was working as a confederate of Marsha Kay Holloway or any person associated with Nature's Own to engage in any kind of skullduggery." J. Fitzgerald Dep. Tr. 119:17-120:5; 120:6-121:2 (Ex. G).

There remains no evidence of intent to deceive (scienter) as to Marble Bridge's misrepresentation/concealment claims, on which it remains ominously silent.

Despite its burden to come forward with admissible evidence to support its claim that Euler had actual knowledge of the fraud against Marble Bridge, Marble Bridge comes up empty-handed.

**E. Negligent Misrepresentation**

As for its claim for "Negligent Misrepresentation/Civil Code Sections 1709 *et seq*., 1573") (Fourth Claim, Am. Compl. ¶¶ 140-149) (Ex. A), Marble Bridge acknowledges that "a cause of action for negligent misrepresentation is similar to an action for fraud, except that intent to deceive is unnecessary." Opp. Mem. at 13. What does it offer in support of such a claim? First, that "Euler's maintenance and granting of credit limits for the Nature's Own buyers was an affirmative representation that the buyers were credit worthy" (Opp. Mem. at 15-16); and second, that "Euler misrepresented in its marketing materials . . . false commercial information . . . . that Euler maintained a proprietary database containing information on 40,000,000 companies, and that Euler conducted on-site, high-risk debtor visits to assimilate information" (Opp. Mem. at 17).

The first is simply a canard. This case has nothing to do with whether any **Buyer** was "credit worthy." There were no "credit losses" to Nature's Own in the absence of any actual sales on credit, so the solvency (or creditworthiness) of **Buyers** as to payment for **Shipments** of **Covered Products** never became an issue. Euler did not purport to insure against fraud, and made no representations that it did. This is just another way of saying that granting a **Credit Limit** on a **Buyer** implied that such **Buyer** was only involved in legitimate activity in its business. Negligent misrepresentation requires a false "positive assertion" or "assertion of fact," and not a mere "implied assertion." *Wilson v. Century 21 Great Western Realty*, 15 Cal. App. 4th 298, 306, 18 Cal. Rptr. 2d 779 (1993).

The second point is simply misleading. It is a mischaracterization of a snippet from a marketing brochure (with no evidence that anyone from Marble Bridge read let alone relied upon it) that "[Euler's] risk management philosophy, where financial and credit professionals monitor large and higher-risk debtors, conduct debtor visits to capture and



CORNERSTONE LAW GROUP

assimilate valuable proprietary information, and respond quickly to new coverage requirements" (EULER HERMES - CONFIDENTIAL – 00510),[7] so as to imply that Euler is thereby undertaking "on-site, high-risk debtor visits" on every **Buyer** on every policy application. The marketing materials do not assert that. And there is no basis of liability for negligent misrepresentation by implication. *Id.*

**F. RICO Claims (No Leave Granted)**

Marble Bridge argues for "RICO" claims it had earlier proposed to bring (18 U.S.C. § 1962(c) (proposed Ninth Claim) and 18 U.S.C. § 1962(d) (proposed Tenth Claim)), despite the Court not having granted leave to assert such claims, for which Marble Bridge never sought reconsideration, and which remains the law of this case.[8]

Marble Bridge's opposition fails to set forth any evidence regarding the specifics of its RICO claims.

Section 1962(c) of RICO

> makes it illegal for "any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a civil claim for a RICO violation under § 1962(c), a plaintiff must show: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Rezner v.*

[7]Also omitted is the transmittal email dated June 22, 2006 (MBFG 002960) from Euler's John Fitzgerald to MBFG's Andrew Krone stating "here is general info we typically email to a prospect. Let me know if you need anything else on Duty Free," showing that materials were provided four years before the Nature's Own Policy, regarding another insured (Duty Free Golf). MBFG fails to include the full documents, e.g., it includes only one page (EULER HERMES-CONFIDENTIAL-004623) from a May 14, 2009 brochure for STC Capital Bank (EULER HERMES-CONFIDENTIAL 004617-4626) but leaves out the parts stating that "[Credit] Insurance *is not a substitute for a sound credit management process*" and doesn't eliminate the need for a credit department and that "Business Credit Insurance" is "*Part* of Sound Risk Management Strategy." EULER HERMES-CONFIDENTIAL 004619, 004621 (emphasis added).

[8]Marble Bridge misreads the Court's Order (Dkt. No. 170), which addressed not only the "futility" issue but also the core issue of prejudice as to late-stage amendment, and granted leave only as to "*those* claims," the antecedent being "(a) to add claims against Defendant aiding and abetting a fraud and fraud and deceit by misrepresentation and concealment, (b) to change the negligence claim to one for negligent misrepresentation, and (c) to more specifically plead the existing claims against Defendant."



CORNERSTONE LAW GROUP

> *Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2011). . . .
>
> RICO defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). To establish the existence of such an associated-in-fact enterprise, a plaintiff must provide: (1) evidence of an ongoing organization, formal or informal; and (2) evidence that the various associates function as a continuing unit. *Odom v. Microsoft Corp*., 486 F.3d 541, 552 (9th Cir. 2007).

*Quan v. San Francisco Police Dep't*, No. C 10-01835 MEJ, 2012 U.S. Dist. LEXIS 139530, *52-53 (N.D. Cal. Sept. 27, 2012). A RICO plaintiff must also show that the injury to his business or property was proximately caused by the prohibited conduct and that he has suffered a concrete financial loss. *Chaset v. Fleer/Skybox Int'l, L.P*., 300 F.3d 1083, 1086 (9th Cir. 2002).

> [T]he Supreme Court provided its interpretation of the § 1962(c) requirement that the defendant "conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs. . . ." *Reves v. Ernst & Young*, No. 91-886, slip op. at 7 (1993). The *Reves* Court narrowly interpreted the phrase, concluding that for liability to attach "one must participate in the operation or management of the enterprise itself." *Id*. at 8-9.

*Pacific. Gas & Elec. Co. v. Howard P. Foley Co*., No. 94-16162, 1996 U.S. App. LEXIS 6522, *22 (9th Cir. March 6, 1996).

Here, Marble Bridge's purported RICO claims are based on mail and wire fraud as predicate acts. "To allege a violation of the mail fraud statute, it is necessary to show (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and

CORNERSTONE LAW GROUP

(3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1399-1400 (9th Cir. 1986). The elements of wire fraud are identical but require use of the United States wires rather than the mails. *Id*. at 1400.

There is no evidence presented that Euler used the mails or "wires" at all in anything having to do with Nature's Own's fraud, let alone any fraud on Euler's part (for which there remains no evidence in any event). Marble Bridge would be obliged to present admissible evidence establishing that Euler violated the mail fraud statute, 18 U.S.C. section 1341, and that (1) Euler formed a scheme or artifice to defraud, (2) Euler used the United States mails or caused a use of the mails in furtherance of the scheme, and (3) Euler did so with the specific intent to deceive or defraud. *Id.*, 806 F.2d at 1400.

Similarly, in order to defeat Euler's motion for summary judgment regarding alleged wire fraud, Marble Bridge must present admissible evidence that Euler committed a wire fraud violation under 18 U.S.C. and that (1) Euler formed a scheme or artifice to defraud, (2) used the United States wires or causing a use of the wires in furtherance of the scheme, and (3) Euler did so with the specific intent to deceive or defraud Marble Bridge. *Id*. Once again, Marble Bridge's opposition to Euler's summary judgment is completely devoid of probative evidence that Euler did any of these things, or even knew they were going on.

In short, Marble Bridge has no RICO claims since it was not granted leave to assert them by amendment, and even if it had been, it has no evidence to support them.

**CONCLUSION**

Since there is no coverage under the Policy and no evidence to sustain Marble Bridge tort claims, summary judgment should be granted and all claims of the Amended Complaint dismissed with prejudice.

Dated: June 23, 2015

Respectfully submitted,

HALPERIN BATTAGLIA BENZIJA, LLP

Andrew P. Saulitis Digitally signed by Andrew P. Saulitis DN: cn=Andrew P. Saulitis, o, ou, email=apslaw@msn.com, c=US Date: 2015.06.23 17:46:54 -04'00'

Andrew P. Saulitis
Neal W. Cohen
40 Wall Street – 37th Floor
New York, New York 10005
Tel: (212) 765-9100/Fax: (212) 765-0964
Email: apslaw@msn.com
NCohen@halperinlaw.net

-and-

CORNERSTONE LAW GROUP
Renée C. Callantine (State Bar No. 155991)
CORNERSTONE LAW GROUP
575 Market Street, Suite 3050
San Francisco, California 94105
(415) 230-8737/ (415) 974-6433 (Fax)
Email: RCallantine@cornerlaw.com

*Attorneys for Defendant Euler Hermes Amer. Credit Indem. Co. n/k/a Euler Hermes No. Amer. Ins. Co.*