Vincent P. Hurley #111215
Ryan M. Thompson #292281
LAW OFFICES OF VINCENT P. HURLEY
A Professional Corporation
28 Seascape Village
Aptos, California 95003
Telephone: (831) 661-4800
Facsimile: (831) 661-4804

Attorneys for Plaintiff/Counter-Defendant
MARBLE BRIDGE FUNDING GROUP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARBLE BRIDGE FUNDING GROUP, INC.,<br><br>Plaintiff,<br>vs.<br><br>EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY,<br><br>Defendant. | Case No. CV12-02729-EJD<br><br>Related to Case Nos. CV12-01839-EJD and CV15-00177-EJD<br><br>REPLY OF PLAINTIFF/COUNTER-DEFENDANT MARBLE BRIDGE FUNDING GROUP, INC. TO EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY'S OPPOSITION TO MARBLE BRIDGE'S MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS |
| AND RELATED COUNTERCLAIMS | Date: July 2, 2015<br>Time: 9:00 a.m.<br>Courtroom 4, Fifth Floor<br>Honorable Judge Edward J. Davila |

/ / /

/ / /

**TABLE OF CONTENTS**


I. STATEMENT OF THE CASE ..... 1

II. STATEMENT OF UNDISPUTED FACTS ..... 1

III. ARGUMENT ..... 6

A. Summary Judgment Should be Granted in Favor of Marble Bridge as to Euler's Counterclaim IV for Rescission. ..... 6

1. There was no concealment or misstatement. ..... 7

2. Material facts. ..... 8

3. Fraudulent intent. ..... 9

B. Summary Judgment Should be Granted in Favor of Marble Bridge as to Euler's Counterclaim V for Deceit. ..... 11

1. There was no false representation, concealment or non-disclosure. ..... 11

2. Knowledge of falsity. ..... 13

3. Intent to defraud, i.e., to induce reliance. ..... 14

4. Justifiable reliance. ..... 15

5. Resulting damage. ..... 16

IV. OBJECTIONS TO EULER'S EVIDENCE ..... 18

V. CONCLUSION ..... 19

## TABLE OF AUTHORITIES


I. STATE STATUTES:

California Civil Code § 1572 .......... 11

California Civil Code § 1709 .......... 11

California Insurance Code § 331 .......... 6

California Insurance Code § 338 .......... 6

California Insurance Code § 359 .......... 6

II. FEDERAL RULES:

Federal Rule of Civil Procedure 56(c) .......... 19

III. FEDERAL CASES:

*B. Braun Medical, Inc. v. Rogers*
163 Fed.Appx. 500 (9th Cir. 2006) .......... 17, 18

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .......... 15

*Fairbank v. Wunderman Cato Johnson*
212 F.3d 528 (9th Cir. 2000) .......... 15

*Peterson v. Wells Fargo Bank N.A.*
No. 13-03392, 2014 WL 3418870, at *2 (N.D.Cal July 11, 2014) .......... 17

*Twin City Fire Ins. Co. v. Mitsubishi Motor Credit of America, Inc.*
2006 U.S. Dist. Lexis 97165 (Central Dist. CA Aug 15, 2006) .......... 7

IV. STATE CASES:

*Agnew v. Parks*
172 Cal. App. 2d 756 (1959) .......... 17, 18

*Alliance Mortgage Co. v. Rothwell*
10 Cal.4th 1226 (1995) .......... 15, 17

*Archdale v. American Intern. Specialty Lines, Inc. Co.*
154 Cal. App. 4th 449 (2007) .......... 12, 18

*Cummings v. Fire Ins. Exchange*
202 Cal. App. 3d 1407 (1988) .......... 8

*D'Amico v. Board of Medical Examiners*
11 Cal.3d 1 (1974) .......... 18

*Douglas v. Fidelity Nat'l Ins. Co.*
229 Cal. App. 4th 392 (2014) .................................................................7

*L.A. Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*
156 Cal. App. 4th 1259 (2007) ...............................................................7

*Mesmer v. White*
121 Cal. App. 2d 665 (1953) .................................................................11

*Small v. Fritz*
30 Cal.4th 167 (2003) ...........................................................................11, 17

*Visueta v. General Motors Corp.*
234 Cal. App. 3d 1609 (1991) .........................................................12, 18

## PLAINTIFF/COUNTERDEFENDANTS' REPLY TO OPPOSITION

Plaintiff/Counter-Defendant Marble Bridge Funding Group, Inc. ("Marble Bridge", "MBFG") hereby replies to Defendant/Counter-Complainant EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY'S ("Euler's") Opposition to Marble Bridge's Motion for Summary Judgment.

## I.

## STATEMENT OF THE CASE

Marble Bridge's Reply will first address the undisputed facts of the case. Marble Bridge will then address Euler's legal arguments pertaining to their claim for Rescission (Counterclaim IV), and alternatively, their claim for Fraud and Deceit (Counterclaim V). Finally, Marble Bridge will make objections to Euler's evidence.

## II.

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:

Euler provided credit insurance, insuring the buyers on the Nature's Own insurance policy to which Marble Bridge Funding Group was a beneficiary. **Facts Nos. 1, 70.**[1] The Euler-Nature's Own policy was renewed by Euler on October 27, 2011. **Facts Nos. 2, 71**. The buyers identified by Nature's Own from which Marble Bridge purchased invoices that were granted credit limits by Euler included Apothecary Innovations, Equipack, Florida Beef Cooperative, Iberian Horse Association, International Air Cargo, Monde Group. Phantom Sport Horses, and Rancho Linda Marchadores. **Facts Nos. 3, 72**.

In April 2010, Euler Sales Vice President John Steel and Roger Allen of finance company LSQ were in the process of agreeing on a deal wherein LSQ would purchase invoices from a company operated by Holloway under a policy insured by Euler. **Fact No. 44.** Roger Allen of LSQ sent an article to John Steel regarding Marsha Kay Holloway, reporting that Holloway was a convicted felon who was previously jailed for a criminal fraud in which she swindled $400,000. **Fact No. 45.**

[1] The referenced facts are those contained in Marble Bridge's "Reply Separate Statement," which is filed with the

On July 13, 2010, Euler's VP Haigley wrote back to Euler Agent Janny Fleitas: "If you think there is fraud involved or think the policy should not be in place because it may be 'bad business' then lets talk about ending the relationship ASAP …" **Fact No. 50**. Euler's Steven Redmer commented on the Fleitas information about US Hay*: "Shady!!!"* **Fact No. 51.**

When the fraudulent buyers on a Euler insured policy with US Hay previously stopped paying Factor King, a factor on the Euler-US Hay policy, Factor King submitted its claims to Euler with the invoices and subsequently sued Euler. **Fact No. 39.** Buyers for which claims were filed on the Euler-US Hay Direct policy included companies on the Euler-Nature's Own policy, including Nature's Own, Rancho Linda Marchadores, and Barbed Wire Cattle. **Fact No. 40**. Despite the Factor King claim, Euler continued to insure Nature's Own in Nature's Own's capacity as both an insured and as a buyer on various policies. **Fact Nos. 41, 105**. Factor King subsequently sued Euler in May 2011. **Fact No. 104.**

On May 10, 2011, Euler received a claim in excess of $300,000 from Gulf Coast Business Credit ("Gulf Coast"), which had just been defrauded on a Euler policy insuring Equipack. **Fact Nos. 54, 106**. Equipack had been a frequently listed fake *buyer* on other Euler policies, including the Euler-Nature's Own policy written on November 1, 2010, and renewed in October 2011, (**Facts Nos. 2, 3, 60, 64, 71, 72, 115**) which was later used to facilitate the fraud on Marble Bridge. Three of the four Euler-Equipack buyers for which claims were filed were also the subject of filed claims on the Euler-U.S. Hay policy related to the fraud on Factor King discussed above for which Euler was sued. **Facts No. 33, 40, 97**. On the US Hay and Equipack policies, Nature's Own was one of those repeat buyers for which claims were filed, as was Rancho Linda and Barbed Wire Cattle. **Facts Nos. 33, 40, 97.** In May 2011, Anette Zimmerman was identified to Euler as the contact person for Nature's Own, as a buyer on the Euler-Equipack policy. **Fact Nos. 56, 108.**

In September 2011, Florida State Attorney General Phil Hanson called Euler Assistant General Counsel Deborah Stuehrmann and informed Stuehrmann that the Florida State Attorney General was conducting a criminal investigation regarding U.S. Hay Direct, Equipack LLC,

Holloway, and Winters. **Fact Nos. 57, 109.** Euler knew that the buyers listed for the Euler-U.S. Hay Direct policy included Rancho Linda Marchadores, Iberian Horse, and Phantom Sport Horses, which were all also Nature's Own buyers. **Fact Nos. 59, 111.** Euler knew that Equipack LLC was also a Nature's Own Buyer. **Fact No. 60.**

Additionally, on February 9, 2012, Euler received a high risk alert on International Air Cargo. **Fact No. 62**. This provided further evidence regarding Euler's knowledge of the fraud.

On February 9, 2012, Dun & Bradstreet sent a Higher Risk Alert on Interntaional Air Cargo to Euler. See **Hurley Declaration in Support of Reply ("Hurley Dec. #2") ¶¶3, 6**, **Exs. SS and VV**. The first International Air Cargo Higher Risk Notification to Euler was April 28, 2010 (April 23, 2010 report). **Hurley Dec. #2 ¶¶2, 4, Exs. RR and TT**. The notification stated:

> "On April 23, 2010, a check of records with directory assistance found no record of a phone listing for the company name . . . a reverse lookup on the phone listing previously provided found no corresponding listings. Also, investigation with outside sources revealed the captioned address to be an executive suite facility that provides shared office space, mail and phone services. A check of records with Miami Florida Finance Department on April 26, 2010 found no record of a required business tax receipt and occupational license . . . payment experiences supporting the stature of operations indicated have not been reported related to the subject company through this trade program . . . A review of D&B's historical records shows that a company which was assigned a higher risk status by D&B in November 2009 due to informational discrepancies made an inquiry on the D&B file of the subject company in 2009 and 2010 . . ." See **Ex. RR, Stuehrmann Depo. 366:12 – 367:8; Stuehrmann Depo. Ex. 47 pages 023017** and **023018, (Ex. TT)**.

The second notification was December 2011 (October 12, 2011 report) (see **Hurley Dec. #2 ¶¶2, 5**, **Exs. RR and UU).** On December 8, 2011, Euler had notice via a Dun & Bradstreet Business Information Report about International Air Cargo. **Ex RR,** Stuehrmann Depo. 370:17 – 371:4; Stuehrmann Ex. 47, pages 017381 to 017384 **(Ex. UU)**. The information provided to Euler by Dun & Bradstreet indicated that the information of April 23, 2010 was re-checked on October 12, 2011 and it was found that there was no record of a phone listing for the company, the listed phone number went to a different business, the listed address was an executive suite facility, and attempts to confirm that this company was active at the listed address were unsuccessful. Dun & Bradstreet repeated that its April 26, 2010 check found no record of a

required business tax receipt or occupational license, there were no payment experiences supporting the stature of operations for the company, the company had been assigned a higher risk status since November 2009 due to informational discrepancies, and had made inquiries on Dun & Bradstreet file on IAC in 2009 and 2010.

The third Higher Risk Notification to Euler was February 9, 2012 (February 8, 2012 report) **(Hurley Dec. #2 ¶¶3, 6, Exs. SS and VV**. The February 9, 2012 Higher Risk warning stated:

> "On Apr 23, 2010, Oct. 12, 2011 & Feb. 8, 2012 a check of records with directory assistance found no record of a phone listing for the company name in Miami, Fl. Area. On Apr. 23, 2010, a reverse look-up of a phone listing previously provided by the company (305) 423-7012 found no corresponding listings. Calls to this phone number on Oct. 12, 2011 reached a different business name. On Feb. 8, 2012, outside sources report the current phone listings provided to both be VoIP [voice over internet] services.
>
> "Also, the investigation with outside sources revealed both the headquarters and branch addresses to be executive suite facilities that provide shared & virtual office space, mail and phone services. Attempts to confirm the subject company active at the … address on Oct. 12, 2011 were unsuccessful. On Dec. 1, 2011, Jim Davis, who gave a title of CFO, reported information to D&B indicating that the landlord/property manager name for the new branch at the Brickell Ave address was a company called Manchester Group Inc, based in Denver, CO. Outside sources report the office facility is owned and operated by other third parties. It is noted that the D&B file for Manchester Group, Inc … was assigned a higher risk status by D&B as of November 2009 due to informational discrepancies."

So, Euler did not just have notice on February 9, 2012; it had notice three times between April 2010 and February 9, 2012, even though Stuehrmann claims that Euler did not suspect fraud or improper conduct until February 9, 2012. **Hurley Dec. #2 ¶7**.

In January 2012, Marble Bridge was receiving a continuous stream of payments from the Nature's Own Buyers, totaling $623,854.54. **Declaration of Tammy Mooney in Support of MBFG Reply Separate Statement ("Mooney Dec. #2"), ¶2, Exhibit PP**. **Fact Nos. 4, 74.**

In February, 2012, Euler received information alerting it that "Buyers" on the Nature's Own Inc./Nature's Own Pharmacy LLC Policy were suspicious, possibly fraudulent. **Declaration of Ryan M. Thompson ("Thompson Dec.") Exhibit QQ** (Euler's Amended Counterclaim ¶49); **Facts Nos. 67, 118.**

Euler suspected that Nature's Own was involved in fraudulent activity in February 2012, when Stuehrmann called Florida attorney general Hanson. **Facts Nos. 31, 67, 95, 118**. Euler suspected or knew that Nature's Own buyer Iberian Horse Association was under criminal investigation for fraud when Stuehrmann called Florida attorney general Phil Hanson in February 2012. **Fact No. 35**. Euler knew in February 2012 when Stuehrmann called attorney general Hanson that Rancho Linda was one of the buyers being investigated in fraudulent activity. **Fact Nos. 37, 101**. Euler suspected that Nature's Own buyer Florida Beef was involved in fraudulent activity when Stuehrmann called attorney general Hanson in February 2012. **Fact Nos. 38, 102.**

Buyers on both the US Hay policy and the Nature's Own policy that Stuehrmann called attorney general Hanson about in February 2012 included Apothecary, Equipack, Florida Beef, Iberian Horse Association, International Air Cargo, Monde Group, Nature's Own, Phantom Sport Horses, Rancho Linda Marchadores, and others. **Fact Nos. 64, 115.** When she called Hanson in February 2012, Hanson confirmed to Stuehrmann that the companies Stuehrmann identified were under investigation. **Fact Nos. 65, 116**.

On February 27, 2012, Euler canceled credit limits on some of the Nature's Own buyers. **Facts Nos. 8, 73.** Euler ordered that all inquiries about credit limit cancellations must be referred to corporate counsel Deborah Stuehrmann. **Facts Nos. 13, 79.**

On February 27, 2012 Leonard Freeman, a Euler sales agent in Florida, received notice of the same credit limit cancellations of buyers as were received for the Nature's Own buyers used to defraud MBFG. Euler's Florida-based employee, Freeman, asked Euler officials, *"This doesn't explain the rest of the cancelations, though. Who do I need to talk to for more details? Can I tell them we think this is a factoring scam"*. The response from Euler Vice President Heather Cole was, *"Absolutely not. Hold tight."* When Euler employee Freeman asked Euler Regional Vice President Montes de Oca if he could tell insureds that Euler thought there was a fraud, Regional Vice President de Oca responded, *"I would be careful what you say. Stick to the cancelation of debtors issue."* See **Fact Nos. 12, 78**, **Marble Bridge Exhibit D** and **Exhibits DD** and **EE** in MBFG Separate Statement, and **Fact No. 14.**

In California, Euler Vice President John Fitzgerald told Euler employee Lynn Murphy, "*Don't talk about this to anybody. May be a fraud scheme here. Marble Bridge included. You know nothing*." **Fact Nos. 12, 78.** Euler Vice President Fitzgerald confirmed, "*I'm directed not to discuss it and that's what I did.*" See **Fact Nos. 12, 78;** Fitzgerald **Ex. C** and **Exs. FF, GG and HH** submitted in Marble Bridge Separate Statement.

On March 6, 2012, Euler Vice President Paul Haigley wrote to Nature's Own offering to rescind the Nature's Own policy and repay all premiums to Nature's Own, stating,

> "…we are offering you the option of rescinding the policy in its entirety, from inception, and would return the premium that you have paid." **See Fact 16, 80.**

On March 7, 2012, MBFG submitted its claims to Euler. **Fact Nos. 17, 84.** Before submitting the insurance claims, MBFG president Candau wrote to his attorneys and the FBI to tell them the claims were being submitted and the situation was "stranger by the day". **Fact Nos. 28, 82**. There was no term in the policy allowing for rescission and return of premiums already paid. **Fact No. 83.** MBFG submitted more information than the claims. On March 8, 2012, MBFG attorneys wrote to Euler Vice-President Paul Haigley, referring to and attaching the MBFG claims summaries, confirming that MBFG had relied on the due diligence of Euler in issuing the policy and credit limits prior to MBFG accepting NOP as a client, and objecting to Euler trying to rescind. **Facts Nos. 29, 93**. Haigley did not respond to the letter and immediately gave the March 8, 2012 MBFG letter to Euler's legal department. **Facts Nos. 30, 94**.

## III.

## ARGUMENT

### A. Summary Judgment Should be Granted in Favor of Marble Bridge as to Euler's Counterclaim IV for Rescission.

In order to satisfy the requisite elements of rescission that might apply under California Insurance Code sections 331; 338; and 359, Euler must prove:

(1) Marble Bridge made a *concealment or misstatement*;

(2) of *material facts*; and

(3) did so with *fraudulent intent*.

*Douglas v. Fidelity Nat'l Ins. Co.*, 229 Cal. App. 4th 392, 408 (2014); *L.A. Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.,* 156 Cal. App. 4th 1259, 1269- 1270 (2007). Euler relies on trial court dicta[2] to overcome established California precedent that rescission for "false claims" requires that the claimant possessed a *fraudulent intent*. *L.A. Sound USA, Inc.*, 156 Cal. App. 4th at 1270.

Here, the undisputed facts demonstrate that Euler has failed to satisfy its burden with regard to each and every element in its claim for rescission.

**1. There was no concealment or misstatement.**

Marble Bridge did not conceal or misrepresent when it did not know what to make of the information. On one hand, in January 2012, an investigator could not confirm addresses and products (**Fact Nos. 4, 74**), and on the other hand, in January 2012, Marble Bridge was receiving a continuous stream of payments from the Nature's Own Buyers, totaling $623,854.54. **Mooney Dec. #2, ¶2, Exhibit PP**, **Fact Nos. 4, 74.** So, Marble Bridge was faced with the quandary that there was suspicion, but at the same time, the buyers paid $623,854.54 for invoices purchased in the previous two months. That list includes January 3, 2012, $52,308.50; January 4, 2012, $65,555.90; January 5, 2012, $37,917.50; January 5, 2012, $27,949.79; January 9, 2012, $69,200.03; January 9, 2012, $37,372.85; January 10, 2012, $53,146.80; January 11, 2012, $42,064.60; January 17, 2012, $59,423.50; January 18, 2012, $72,655.46; January 20, 2012, $39,385.61; January 23, 2012, $51,874.00; and, finally, on February 27, 2012, $15,000.00. **Fact Nos. 4, 74; Mooney Dec. #2, ¶3, Exhibit PP**. The payments supported the conclusion that the buyers did exist.

On March 7, 2012, after Euler canceled credit limits (**Fact No. 8**) without explanation and after receiving the rescission offer letter from Euler to Nature's Own (**Fact Nos. 16, 80**), MBFG submitted its claims to Euler. **Fact Nos. 17, 84.** The invoices for which claims were made were all past due as of March 7, 2012. **Facts Nos. 4, 18, 74**. Before submitting the

[2] *Twin City Fire Ins. Co. v. Mitsubishi Motor Credit of America, Inc*., 2006 U.S. Dist. Lexis 97165 (Central Dist. CA Aug 15, 2006).

insurance claims, on March 7, 2012, MBFG president Candau wrote to his attorneys and the FBI to tell them the claims were being submitted, stating,

> "FYI – see attached very interesting letter sent fedex to us as a cc and addressed to Anette of Nature's Own offering them the option of retroactively rescinding their insurance policy coverage (eg so as not to have to payoff on claims???) now that they have cancelled the coverage. Is this even legal??? We are going to submit our claim today to Euler on all of our invoices … this gets stranger by the day …". **Candau Dec. Ex. MM**, **Fact Nos. 28, 82**.

Marble Bridge President Paul Candau told the FBI in advance and directed filing of the claims because Marble Bridge suspected then that Euler was trying to rescind so that Marble Bridge could not file a claim, and the whole situation was "stranger by the day". See **Facts Nos. 4, 25, 26, and 28, 74, 82**. One does not report his suspicions to the FBI about an insurance company while simultaneously trying to defraud the insurance company.

Not only was there no concealment or misrepresentation, MBFG submitted more information than the claims. On March 8, 2012, MBFG attorneys wrote to Euler Vice-President Paul Haigley, referring to and attaching the MBFG claims summaries, confirming that MBFG had relied on the due diligence of Euler in issuing the policy and credit limits prior to MBFG accepting Nautre's Own Pharmacy as a client, and objecting to Euler trying to rescind. **Fact No. 29**. Haigley did not respond to the letter and immediately gave the March 8, 2012 MBFG letter to Euler's legal department. **Fact Nos. 30, 94**. Euler has failed to satisfy the "misrepresentation" element required for its claim for rescission.

**2. Material Facts.**

A misrepresentation in a claim for policy benefits is material if it concerns a subject reasonably relevant to the insurer's investigation, and if a reasonable insurer would attach importance to the fact misrepresented. *Cummings v. Fire Ins. Exchange*, 202 Cal. App. 3d 1407, 1417 (1988).

Euler concedes that prior to the date Marble Bridge filed its claims, Euler already knew about the Nature's Own fraud. See **Thompson Dec., Ex. QQ** (Euler Amended Counterclaim ¶49); **Fact Nos. 31, 95**, stating:

> "[i]n or around February, 2012, Euler received information alerting it that "Buyers" on the Nature's Own Inc./Nature's Own Pharmacy LLC Policy were suspicious, possibly fraudulent.."

Also see Stuehrmann testimony, 395:10-22; 400:7-401:5; **Fact Nos. 31, 95,** wherein Stuehrmann agrees that Euler knew in February 2012 that the buyers were suspicious and possibly fraudulent.

Euler suspected that Nature's Own was involved in fraudulent activity in February 2012, when Stuehrmann called Florida attorney general Hanson. **Fact Nos. 31, 95**. Euler suspected or knew that Nature's Own buyer Iberian Horse Association was under criminal investigation for fraud when Stuehrmann called Florida attorney general Phil Hanson in February 2012. **Fact Nos. 35, 99**. Euler knew in February 2012 when Stuehrmann called attorney general Hanson that Rancho Linda was one of the buyers being investigated in fraudulent activity. **Fact Nos. 37, 101**. Euler suspected that Nature's Own buyer Florida Beef was involved in fraudulent activity when Stuehrmann called attorney general Hanson in February 2012. **Fact Nos. 38, 102.**

Buyers on both the US Hay policy and the Nature's Own policy that Stuehrmann called attorney general Hanson about in February 2012 included Apothecary, Equipack, Florida Beef, Iberian Horse Association, International Air Cargo, Monde Group, Nature's Own, Phantom Sport Horses, Rancho Linda Marchadores, and others. **Fact Nos. 64, 115.** When she called Hanson in February 2012, Hanson confirmed to Stuehrmann that the companies Stuehrmann identified were under investigation. **Fact Nos. 65, 116**. On February 27, 2012, Euler canceled credit limits on some of the Nature's Own buyers that owed money to MBFG. **Fact No. 8.**

Since Euler already knew about the fraud, Marble Bridge's alleged concealment/misrepresentations (which are denied) were not, and indeed could not, have been "reasonably relevant" to Euler's investigation regarding Marble Bridge's claims. Euler has failed to satisfy the "material facts" element required for its claim for rescission.

**3. Fraudulent Intent.**

The undisputed facts demonstrate that in filing its claims with Euler, Marble Bridge did not possess the fraudulent intent to deceive Euler.

On March 7, 2012, MBFG submitted its claims to Euler. **Fact Nos. 17, 84.** MBFG was suspicious (**Fact Nos. 4, 74**), but having been paid almost $624,000 in January and February 2012 (**Fact Nos. 6, 76**), and having seen Euler increase credit limits on the same buyers in January 2012 (**Fact Nos. 3, 5, 72, 75**), and then cancel credit limits without explanation (**Fact No. 8**), and then having received the unexplainable Euler offer to Nature's Own "… offering you the option to rescind … and would return the premium…" (**Fact Nos. 16, 80**), MBFG reasonably considered the invoices past due (**Fact No. 18**). Why shouldn't Marble Bridge think Nature's Own was real and the payments were past due? See **Facts Nos. 19** to **28**.

Euler's arguments to the contrary lack any material evidence, and defy the facts and logic. If Euler thought Nature's Own was real and deserving of a refund, and Euler was so oblivious to the fraud committed on Marble Bridge, why did Euler Vice-President John Fitzgerald tell Euler employee Murphy in February 2012, *"Don't talk about this to anybody. May be a fraud scheme here. Marble Bridge included. You know nothing."* **Fact Nos. 12, 78.** Additionally, why did Euler Vice-Presidents tell Euler's Florida agent Freeman, *"Absolutely not. Hold tight" and, "be careful what you say"* when Freeman asked for permission to tell his Florida customers, "*Can I tell them we think this is a factoring scam"* or a *"fraud*" on factors. **Facts Nos. 12, 14, 78**.

There was no material misstatement or misrepresentation. None of the information in the claims was information to which Euler attached any importance, because Euler knew in February 2012 that there was a fraud on MBFG. There was no intent to defraud Euler. **Fact No. 26.** Paul Candau was in contact with the FBI and told the FBI in advance that his company was making an insurance claim. **Fact Nos. 28, 82.**

If any of the three elements required for rescission based on concealment or misrepresentation fails, the cause of action fails. In this case, all three elements fail, and Summary Judgment should be granted on Euler's Counterclaim IV in favor of Plaintiff/Counter-defendant Marble Bridge.

**B. Summary Judgment Should be Granted in Favor of Marble Bridge as to Euler's Counterclaim V for Fraud and Deceit.**

Euler's Counterclaim V asserts fraud and deceit against Marble Bridge under California Civil Code sections 1709 and 1572.

The elements of fraud that will give rise to a tort action for deceit are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Small v Fritz*, 30 Cal.4th 167, 173 (2003). A party may not claim fraudulent concealment if the party had notice of facts sufficient to put a prudent person upon inquiry and if so, whether an inquiry, reasonably conducted, would have disclosed to him the true state of affairs. *Mesmer v. White*, 121 Cal. App. 2d 665, 673 (1953).

**1. There was no false representation, concealment or non-disclosure.**

Paul Candau suspected that Euler was either participating in the fraud, or the invoices were legitimate. See **Fact Nos. 24, 87.** On March 7, 2012, MBFG submitted its claims to Euler. **Fact No. 84.** MBFG was suspicious (**Fact Nos. 4, 74**), but having been paid almost $624,000 in January and February 2012 (**Fact Nos. 6, 76**), and having seen Euler increase credit limits on the same buyers in January 2012 (**Facts Nos. 3, 5, 72** and **75**), and then cancel credit limits without explanation (**Fact No. 73**), and then having received the unexplainable Euler offer to Nature's Own "… offering you the option to rescind … and would return the premium…" (**Fact Nos. 16, 80**), MBFG reasonably considered the invoices past due. **Facts Nos. 18, 89**. Candau believed that either Euler was participating in the fraud, or, in the alternative, that the claims must be legitimate and Euler was trying to avoid paying the claims by rescinding Policy Two. **Fact Nos. 24, 87.**

Further, as previously set forth, at the same time Marble Bridge's investigator was looking into the addresses listed for the Nature's Own buyers, Marble Bridge was receiving a continuous stream of payments from those same buyers in January 2012, totaling $623,854.54. **Thompson Dec., Ex. QQ**; **Mooney Dec ¶2, Exhibit PP**, **Fact Nos. 24, 87.** Accordingly,

Marble Bridge was placed in the unusual situation where it had questions regarding addresses of the buyers, while at the same time, the buyers paid $623,854.54 in payments for invoices purchased. **Thompson Dec., Ex. QQ, Mooney Dec ¶2, Exhibit PP**.

In support of its argument that Euler had no "actual knowledge" of the Nature's Own fraud, Euler provides a declaration from Euler Assistant General Counsel Deborah L. Stuehrmann "presenting what Euler did and did not know during the relevant time frames." **Euler's Opposition, page 16; ¶¶ 11-16; Stuehrmann Dec. ¶¶ 11-18**. Here, portions of Stuehrmann's declaration contradict her earlier sworn testimony. For example, the Stuehrmann declaration offered in support of Euler's Motion for Summary Judgment (**Dkt. 219**), as referenced in Euler's Responsive Separate Statement, asserts that the first time Stuehrmann suspected or knew Equipack was involved in the fraud was on October 21, 2013, during Holloway's deposition testimony. Stuehrmann, however, testified during her deposition that she first knew or suspected improper acts or fraud regarding Equipack when Florida Attorney General Hansen called in late September or early October 2011. See **Fact Nos. 32, 96**; **Ex. A** to Marble Bridge's Separate Statement, Stuehrmann Depo., 34:16 – 35:3 and 36:22 – 37:5. Further, Euler asserts, via the same Stuehrmann declaration, that Stuehrmann "received an inquiry from the Florida State's Attorney's Office regarding Marsha Kay Holloway, Greg Winters and a company called U.S. Hay, but no details were given as to the nature of any investigation." See Euler's Response to Marble Bridge's Separate Statement, **Facts Nos. 36, 57, 64, 100, 109, 115**. Again, however, Stuehrmann testified multiple times that Euler was aware in September 2011 that there was a criminal investigation of U.S. Hay and Equipack and that Rancho Linda Marchadores was one of the U.S. Hay/Equipack buyers. See **Exhibit A** to Marble Bridge's Separate Statement, Stuehrmann Depo. 74:2-8.

"Admissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment." *Visueta v. General Motors Corp.,* 234 Cal. App. 3d 1609, 1613 (1991); see also *Archdale v. American Intern. Specialty Lines, Inc. Co.*, 154 Cal. App. 4th 449, 473 (2007) "[w]here a party's self-

serving declarations contradict credible discovery admissions and purport to impeach that party's own prior sworn testimony, they should be disregarded." Therefore, Stuehrmann's declaration in support of Euler's Motion for Summary Judgment (**Dkt. 219**), paragraphs 11-18; and n.16 should be disregarded.

The undisputed facts demonstrate that Euler has failed to satisfy the requisite "misrepresentation, concealment, or non-disclose" element of its fraud and deceit claim.

**2. Knowledge of falsity.**

In or around January and February 2012, Marble Bridge was suspicious of the buyers on the Nature's Own Policy. **Fact Nos. 4, 74.** However, prior to filing its claims, Marble Bridge did not have knowledge of the falsity of the claims. See **Facts Nos. 4, 74.**

Indeed, at the same time Marble Bridge's investigator was looking into the addresses listed for the Nature's Own buyers, Marble Bridge was receiving a continuous stream of payments from those same buyers in January 2012, totaling $623,854.54. **Thompson Dec., Ex. QQ; Mooney Dec ¶2, Exhibit PP, Fact Nos. 6, 76.** Accordingly, Marble Bridge was not certain as to whether or not the buyers were indeed fraudulent. Paul Candau believed either Euler was committing fraud, or the buyers were legitimate and Euler was trying to avoid payment of the insurance coverage. **Fact Nos. 24, 87**

Further, after the credit limits were cancelled, Euler officials told Euler agents and employees not to talk to anyone, including MBFG. **Fact Nos. 12, 78.** Euler ordered that all inquiries about the credit limit cancellations must be referred to corporate counsel Deborah Stuehrmann. **Fact No. 79.**

On February 27, 2012, Leonard Freeman, a Euler sales agent in Florida, received notice of the same credit limit cancellations of buyers as were received for the Nature's Own buyers used to defraud MBFG. Euler's Florida based employee, Freeman, asked Euler officials, *"This doesn't explain the rest of the cancelations, though. Who do I need to talk to for more details? Can I tell them we think this is a factoring scam"*. The response from Euler Vice President Heather Cole was, *"Absolutely not. Hold tight."* When Euler employee Freeman asked Euler

Regional Vice President Montes de Oca if he could tell insureds that Euler thought there was a fraud, Regional Vice President de Oca responded, *"I would be careful what you say. Stick to the cancelation of debtors issue."* See **Facts Nos. 12, 14, 78**, and **Marble Bridge Exhibits D**, **DD** and **EE** to MBFG Separate Statement.

In California, Euler Vice President John Fitzgerald told Euler employee Lynn Murphy, "*Don't talk about this to anybody. May be a fraud scheme here. Marble Bridge included. You know nothing*." **Fact Nos. 12, 78.** Euler Vice President Fitzgerald confirmed, "*I'm directed not to discuss it and that's what I did.*" See **Fact Nos. 12, 78; Fitzgerald Ex. C** and **Exs. FF, GG and HH** to Marble Bridge Separate Statement.

Accordingly, Marble Bridge did not have knowledge of the alleged falsity of its claims, in part because Euler refused to communicate and divulge such information with Marble Bridge. Euler has failed to satisfy the requisite "knowledge of falsity" element of its fraud and deceit claim.

**3. Intent to defraud, i.e., to induce reliance.**

The undisputed facts demonstrate that in filing its claims, Marble Bridge did not possess the intent to defraud Euler.

As previously set forth, in filing its claims, Marble Bridge did not possess the intent to defraud Euler. Again, in the two months before filing the claim, Marble Bridge received almost $624,000 in payments on the purchased invoices. **Fact No. 92.**

Marble Bridge was indeed suspicious of the buyers under the Policy (**Fact Nos. 4, 74**), but, based on the payments, almost $624,000 in January and February 2012 (**Fact Nos. 6, 76**), and having seen Euler increase credit limits on the same buyers in January 2012 (**Fact Nos. 5, 75**), and then cancel credit limits without explanation (**Fact No. 73**), and then having received the unexplainable Euler offer to Nature's Own "… offering you the option to rescind … and would return the premium…" (**Fact Nos. 16, 80**), MBFG reasonably considered the invoices past due (**Fact No. 18**). Further, MBFG tried to obtain information from Euler about the

cancellations, but Euler did not provide any information. **Fact Nos. 10, 77**. Accordingly, based on the aforementioned circumstances, Marble Bridge filed claims with Euler. **Fact Nos. 17, 84**.

There was no intent to defraud Euler. **Facts Nos. 91, 92.** Paul Candau was even in contact with the FBI and told the FBI in advance that his company was making an insurance claim. **Fact Nos. 4, 74.** Euler has failed to satisfy the requisite "intent to defraud" element of its fraud and deceit claim.

**4. Justifiable reliance.**

Euler's Opposition pertaining to its fraud and deceit counterclaim fails to address Marble Bridge's argument that Euler did not "justifiably rely" on Marble Bridge's allegedly false claims. Indeed, this makes sense, as there are no facts to support such an assertion; Euler did not ultimately make a payment to Marble Bridge under the Nature's Own Policy. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (reasoning that the moving party has no burden to negate or disprove matters on which the non-moving party has the burden of proof at trial, but need only point out to the Court through argument and absence of evidence to support the non-moving party's case); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (same).

Notwithstanding that there was no opposition to Marble Bridge's summary judgment motion based on lack of justifiable reliance, the undisputed facts demonstrate that Euler did not "justifiably rely" on Marble's Bridge's allegedly false claims.

> "Reliance" on fraudulent misrepresentation or nondisclosure exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 1239 (1995)."

Euler concedes that prior to the date Marble Bridge filed its claims, Euler already knew about the Nature's Own fraud. **Thompson Dec., Ex QQ**, (Euler Amended Counterclaim ¶49); (**Fact Nos. 67, 118**) stating

> "[i]n or around February, 2012, Euler received information alerting it that "Buyers" on the Nature's Own Inc./Nature's Own Pharmacy LLC Policy were suspicious, possibly fraudulent.."

Also see **Ex. A** to Marble Bridge's Separate Statement, Stuehrmann Depo. 395:10-22, 400:7-401:5, **Fact Nos. 31, 95**, agreeing that Euler knew in February 2012 that the buyers were suspicious and possibly fraudulent.

Euler suspected that Nature's Own was involved in fraudulent activity in February 2012, when Stuehrmann called Florida attorney general Hanson. **Fact Nos. 31, 95**. She called Hanson because in February 2012, Euler received additional information that the buyers on the Nature's Own policy were "suspicious and possibly fraudulent". **Fact Nos. 31, 95.** Euler suspected or knew that Nature's Own buyer Iberian Horse Association was under criminal investigation for fraud when Stuehrmann called Florida attorney general Phil Hanson in February 2012. **Fact Nos. 35, 99**. Euler knew in February 2012, when Stuehrmann called attorney general Hanson, that Rancho Linda was one of the buyers being investigated in fraudulent activity. **Fact Nos. 37, 101**. Euler suspected that Nature's Own buyer Florida Beef was involved in fraudulent activity when Stuehrmann called attorney general Hanson in February 2012. **Fact Nos. 38, 102.**

Buyers on both the US Hay policy and the Nature's Own policy that Stuehrmann called attorney general Hanson about in February 2012 included Apothecary, Equipack, Florida Beef, Iberian Horse Association, International Air Cargo, Monde Group, Nature's Own, Phantom Sport Horses, Rancho Linda Marchadores, and others. **Fact Nos. 64, 115.** When she called Hanson in February 2012, Hanson confirmed to Stuehrmann that the companies Stuehrmann identified were under investigation. **Fact Nos. 65, 116**. On February 27, 2012, Euler canceled credit limits on some of the Nature's Own buyers that owed money to MBFG. **Fact No. 73.**

Therefore, Euler did not "justifiably rely" on Marble Bridge's insurance claims, as Euler already knew about the Nature's Own fraud, and Euler denied the claims. Accordingly, Euler has failed to meet the "justifiable reliance" element of its fraud and deceit claim, and Marble Bridge's Motion for Summary Judgment on counterclaim Count V should be granted in favor of Marble Bridge.

**5. Resulting damage.**

The undisputed facts demonstrate that as a result of Marble Bridge's allegedly false claims, Euler suffered no actual damage.

A plaintiff must suffer actual monetary, out of pocket loss to recover on a fraud claim, and fraud without damage is no ground for an action. *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 1240 (1995). A plaintiff is NOT entitled to attorneys' fees in a lawsuit as damages for fraud. *Id* at 1241. Euler must also show a "cause and effect relationship between the fraud and damages sought. . ." *Small,* 30 Cal.4t at 202.

Euler attempts to "connect the dots" between Marble Bridge's allegedly false claims and Euler's damages by alleging that, "Marble Bridge's concealment of information to which Euler was entitled by law caused Euler to incur legal expense elsewhere", specifically *Factor King, LLC v. Euler Hermes N. Am. Ins. Co.*, No. 11-15978 (N.Y. Sup. Ct. Suffolk Cnty. Filed May 18, 2011). The jump Euler asks the Court to make is incredibly remote. It consists of speculation as to how the trial court judge in the *Factor King* case would have ruled, had she been presented with information Marble Bridge allegedly withheld from Euler. (Even though Euler admits that it knew about the fraud.) Under California law, speculative fraud damages are not actionable. *B. Braun Medical, Inc. v. Rogers*, 163 Fed.Appx.500, 508 (9th Cir. 2006); *Agnew v. Parks*, 172 Cal. App. 2d 756, 768-769 (1959).

In addition, the *Factor King* case was filed and served and was already well underway in the autumn of 2011, even before Euler was informed about the criminal investigation in September 2011. **Facts Nos. 39, 103, 104**. Euler's assistant general counsel confirmed that. **Fact No. 104**. Marble Bridge did not file its claims until March 2012. Therefore, Euler fails to demonstrate any actionable nexus between Marble Bridge's alleged fraud and being "ensnared" in the ongoing *Factor King* case.

Further, Euler concedes it has "difficulty in quantifying" its actual damages. Euler's Opposition, Page 18, ¶¶ 17-18. Indeed, Euler fails to provide any definitive figure regarding its supposed damages, obviously because Euler incurred no actual damages. Euler is not entitled to attorneys' fees in a lawsuit, either in the instant matter nor the *Factor King* case, as alleged damages for fraud. *Alliance Mortgage Co.,* 10 Cal.4th at 1241. Curiously, Euler attempts to rely on a District Court case[3] in the attempt to overcome established California Supreme Court

[3] *Peterson v. Wells Fargo Bank N.A.*, No. 13-03392, 2014 WL 3418870, at *2 (N.D.Cal. July 11, 2014).

precedent that attorneys' fees are not a recoverable item for damages in a fraud case. Euler provides no supporting authority (indeed, there is none) for its argument that the damages element for fraud can be satisfied by legal expenses incurred "elsewhere."

Finally, Euler argues that, "upon rescission of the Policy due to Marble Bridge's fraud and concealment," Euler will be required by law to forfeit the earned premium. This allegation consists of fiction. The parties now know that no entity other than Marble Bridge can receive the premium refund. Nature's Own does not exist. Speculative damages are not actionable in a claim for fraud. See *B. Braun Medical, Inc.*, 163 Fed.Appx. at 508; *Agnew*, 172 Cal. App. 2d at 768-769.

Euler simply has no damages and has failed to satisfy the "damages" element required for its fraud and deceit claim. Accordingly, Marble Bridge's Motion for Summary Judgment should be granted.

**IV.**

**<u>OBJECTIONS TO EULER'S EVIDENCE</u>**

<u>OBJECTION NO. 1:</u>

"Admissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment." *Visueta v. General Motors Corp.,* 234 Cal. App. 3d 1609, 1613 (1991); see also *D'Amico v. Board of Medical Examiners*, 11 Cal.3d 1, 22 (1974); *Archdale v. American Intern. Specialty Lines, Inc. Co.*, 154 Cal. App. 4th 449, 473 (2007).

In support of its argument that Euler had no "actual knowledge" of the Nature's Own fraud, Euler provides a declaration from Euler Assistant General Counsel Deborah L. Stuehrmann "presenting what Euler did and did not know during the relevant time frames." **Euler's Opposition, page 16; ¶¶11-16**; **Stuehrmann Dec. ¶¶ 11-18**. Here, portions of Stuehrmann's declaration contradict her earlier sworn testimony. For example, the Stuehrmann declaration offered in support of Euler's Motion for Summary Judgment (**Dkt. 219**), as referenced in Euler's Responsive Separate Statement, asserts that the first time Stuehrmann

suspected or knew Equipack was involved in the fraud was on October 21, 2013, during Holloway's deposition testimony. Stuehrmann, however, testified during her deposition that she first knew or suspected improper acts or fraud regarding Equipack when Florida Attorney General Hansen called in late September or early October 2011. See **Fact Nos. 32, 96**; **Ex. A** to Marble Bridge's Separate Statement, **Stuehrmann Depo. 34:16 – 35:3** and **36:22 – 37:5**. Further, Euler asserts, via the same Stuehrmann declaration, that Stuehrmann "received an inquiry from the Florida State's Attorney's Office regarding Marsha Kay Holloway, Greg Winters and a company called U.S. Hay, but no details were given as to the nature of any investigation." See Euler's Response to Marble Bridge's Separate Statement, **Facts Nos. 36, 57, 64, 100, 109, 115**. Again, however, Stuehrmann testified multiple times that Euler was aware in September 2011 that there was a criminal investigation of U.S. Hay and Equipack and that Rancho Linda Marchadores was one of the U.S. Hay/Equipack buyers. See **Exhibit A** to Marble Bridge's Separate Statement, **Stuehrmann Depo. 74:2-8**.

Therefore, Stuehrmann's declaration in support of Euler's Motion for Summary Judgment (**Dkt. 219**), paragraphs 11-18; and n.16 should be disregarded.

## V.

## CONCLUSION

Summary judgment, or alternatively, partial summary judgment, should be granted pursuant to Federal Rule of Civil Procedure 56(c) to Claims IV and V of Euler's Amended Counterclaim.

There is no materially disputed fact that could be decided by a jury regarding Euler's Counterclaim IV for rescission, as Euler has failed to satisfy each and every requisite element of rescission.

There is no materially disputed fact that could be decided by a jury regarding Euler's Counterclaim V for fraud/deceit, as Euler has failed to satisfy each and every requisite element of fraud/deceit.

Dated: June 23, 2015

LAW OFFICES OF VINCENT P. HURLEY
A Professional Corporation

By: /s/ Ryan M. Thompson
RYAN M. THOMPSON
Attorneys for Plaintiff/Counter-Defendant
MARBLE BRIDGE FUNDING GROUP, INC.