UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARBLE BRIDGE FUNDING GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> EULER HERMES AMERICAN CREDIT INDEMNITY COMPANY, <br><br> Defendant. | Case No.  5:12-cv-02729-EJD <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 218 |

This case stems from a type of commercial financing known as "factoring" and the variety of insurance unique to that industry. Plaintiff Marble Bridge Funding Group ("MBFG") is a "factor," or a company that provides accounts receivable financing to growing businesses that sell their products or services to other businesses. First Am. Compl. ("FAC'), Dkt No. 176, at ¶ 3. Defendant Euler Hermes American Credit Indemnity Company ("Euler") sells credit or trade insurance, which is "purchased by sellers of goods or services to insure their accounts receiveable should the debtors on ther receiveables fail to pay." Id. at ¶ 4.

MBFG alleges in this action that it was induced by Euler to purchase accounts receivable invoices from another business, Nature's Own, Inc. or Nature's Own Pharmacy LLC ("Nature's

1
Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Own").[1]  Nature's Own turned out to be a fraud, and Euler, who had insured Nature's Own accounts receivable, did not pay MBFG's claims on the policy once the scheme was discovered.

Federal jurisdiction arises pursuant to 28 U.S.C. § 1332.  Presently before the court is Euler's Motion for Summary Judgment, which MBFG opposes.  Dkt. No. 218.  Having now carefully considered the parties' arguments, the court finds that most but not all of Euler's arguments are meritorious.  Thus, the motion will be granted in part and denied in part for the reasons explained below.

## I. BACKGROUND

The basic facts are either undisputed or not reasonably disputed.  Euler is a Maryland insurance company licensed to do business in California.  Decl. of Deborah L. Stuehrmann ("Stuehrmann Decl."), Dkt. No. 219, at ¶ 2.  MBFG is a commercial finance company which, as noted, provides its clients with accounts receivable funding.  Id. at Ex. J.  Commencing on November 1, 2010, Nature's Own had a credit insurance policy with Euler designated as a "Domestic Markets Business Credit Insurance Policy."  Id. at Ex. D.  The original policy was designated as Policy No. 5033862 (the "First Policy"), and was renewed on November 1, 2011, as Policy No. 5041669 (the "Second Policy").  Id.  The terms of First Policy and the Second Policy are nearly identical.  Id.

### A. The Terms of the First and Second Policies

Under the Policies, Euler agreed to provide Nature's Own "insurance against covered credit losses . . . in return for the Premium and [Nature's Own's] compliance . . . ."  Id.  The types of losses covered were further described as follows:

> Subject to terms and conditions of this Policy, [Euler] will cover [Nature's Own] against credit losses due to the non-payment of amounts due from a covered Buyer for Shipments of Covered Products made by [Nature's Own] during the Policy Period, on terms no longer than the Maximum Terms of Sale and which were invoiced in U.S. or Canadian dollars.
> 
> …

---

[1] The distinction between these two companies, if there is one, is immaterial.

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

2

      Credit losses covered under this Policy are:

      1.     The insolvency of a covered Buyer, or

      2.     The Protected Default due to slow payment of a covered Buyer.

Id.

A "Buyer," or a customer of the insured, was defined in the Policies as "a legal entity and its branch offices, trade styles or divisions, if any, which is domiciled in the United States (including Puerto Rico) or Canada and is approved for coverage under the Policy," but "does not include subsidiaries or affiliated corporations, which are separate legal entities." Id. "Covered Products" were defined as "the products and/or services, including associated labor and service costs, described in the Declaration." Id. Specific to the Nature's Own Policy, "Covered Products" were specified in the Declaration as "Pharm Prods/Natural/Organic/Environ Prodts." Id.

The Policies' terms make plain that coverage is contingent on "Shipments of Covered Products." Id. This phrase was defined as "Covered Products which are Dispatched by [Nature's Own] and Delivered to a Buyer." Id. "Dispatched" means "the point in time when Covered Products leave [Nature's Own's] control," and "Delivery" means "the point in time when legal title to and the risk of loss of the Covered Products is transferred to the Buyer and the Covered Products have left [Nature's Own] custody and physical control." Id.

### B.    MBFG's Involvement with Nature's Own and the Policies

On June 22, 2011, MBFG entered into a Receivables Purchase Agreement "in which [MBFG] purchased certain accounts receivable of Nature's Own . . . ." FAC, at ¶ 75. Thereafter, on or about July 3, 2011,[2] Nature's Own requested the issuance of an endorsement to the First Policy in order to make MBFG a beneficiary. Stuehrmann Decl., at Ex. D. This was accomplished through a document entitled "Bank/Lender Policy Beneficiary Endorsement," (the "Endorsement") which in essence granted MBFG the same rights under the First Policy that

---

[2] Though the parties do not dispute the timing of this occurrence, the Request for Beneficiary document contained in the record is dated July 15, 2011.

3
Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Nature's Own would receive absent the beneficiary designation. Id. As relevant to this case, the Endorsement permitted MBFG to file a claim against the First Policy and was entitled to receive any loss payments that would otherwise be payable to Nature's Own. Id. Furthermore, the Endorsement would remain in effect through any policy renewal absent a written release. Id.

The sole member of Nature's Own was an individual named Richard Wallace. Nature's Own also purported to have an account manager named Anette Zimmerman, who completed and signed the credit insurance policy application that was submitted to Euler. Id. Nature's Own, however, was not a legitimate business. Indeed, "[i]t turned out that seemingly normal looking invoices/accounts receivable purchased by [MBFG] were fake, printed up by Nature's Own and 'issued' to 'Buyers' who never bought anything, in order for Nature's Own to exact from [MBFG] substantial amounts of money."[3] Furthermore, Annette Zimmerman was not a real person; this was a "made-up name" for another individual named Marsha Kay Holloway.

### C. MBFG's Policy Claims and Ensuing Litigation

Euler cancelled the Credit Limits for many of Nature's Own's Buyers on February 27th and February 29, 2012. Id. at ¶ 15. On March 7, 2012, MBFG filed claims against the Second Policy for the Nature's Own Buyers whose credit limits had been cancelled. Id. at ¶ 8. Euler did not pay benefits on MBFG's claims, and notified MBFG on or about May 24, 2012, that Euler would deny coverage. Id. at ¶ 10, Ex. N.

MBFG filed an action against Nature's Own Pharmacy LLC and its principals in this court on April 12, 2012. See Case No. 5;12-cv-01839-EJD. MBFG then commenced this action against Euler on May 29, 2012, and filed the FAC on September 12, 2014. These motions followed.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[3] This fact is asserted in Euler's Moving Separate Statement as Fact 45, and is undisputed by MBFG.

law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." Id.

## III. DISCUSSION

MBFG asserts ten claims against Euler in the FAC, including aiding and abetting a fraud, intentional misrepresentation, fraudulent concealment, negligent misrepresentation, declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 et seq., and two claims for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. Euler moves for summary judgment on each of the first eight claims and argues that MBFG was not permitted leave to assert the RICO claims.

### A. Fraud-Based Claims

#### i. Governing Authority

The elements of intentional misrepresentation in California are: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage. Engalla v. Permanente Med. Group, Inc., 15 Cal. 4th 951, 974 (1997). The elements of negligent misrepresentation are similar except that a plaintiff need not show that the defendant knew of the falsity of the statement, but rather that the defendant lacked reasonable ground for believing the statement to be true. McReynolds v. HSBC Bank USA, No. 5:11-cv-05245 EJD, 2012 U.S. Dist. LEXIS 165219, at *6, 2012 WL 5868945 (N.D. Cal. Nov. 19, 2012).

"The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." Graham v. Bank of America, N.A., 226 Cal. App. 4th 594, 606 (2014).

Liability may also be imposed "on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to

6

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." Saunders v. Super. Ct., 27 Cal. App. 4th 832, 846 (1994).

Because MBFG would bear the evidentiary burden at trial on these claims, Euler need only show MBFG's inability to prove them. Celotex Corp., 477 U.S. at 325. MBFG must then produce evidence "such that a reasonable juror drawing all inferences in favor of [MBFG] could return a verdict in [its] favor." Reza v. Pearce, 806 F.3d 497, 505 (9th Cir. 2015) (quoting United States v. Shumway, 199 F.3d 1093, 1103-04 (9th Cir. 1999)).

### ii. Analysis

#### a. Intentional Misrepresentation, Fraudulent Concealment and Aiding and Abetting a Fraud

Euler argues there is no dispute of material fact that Euler cannot prove the knowledge element of its claims for intentional misrepresentation, fraudulent concealment and aiding and abetting a fraud. The court agrees.

"To establish a claim for deceit based on intentional misrepresentation, the plaintiff must prove . . . the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth . . . ."). Manderville v. PCG&S Grp., Inc., 146 Cal. App. 4th 1486, 1498 (2007). Similarly, a claim for fraudulent concealment requires proof that the defendant knew of undisclosed facts that were "unknown to or beyond the reach of the plaintiff." Continental Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal. App. 3d 388, 404 (1989). Furthermore, a claim for aiding and abetting requires actual knowledge of the specific primary wrong the defendant substantially assisted." Upasani v. State Farm Gen. Ins. Co., 227 Cal. App. 4th 509, 519 (2014).

Knowledge, like the other elements of fraud, is a "question of fact" and "like any other fact, it may be proved by circumstantial evidence." Palmquist v. Mercer, 43 Cal. 2d 92, 100 (1954). Indeed, it cannot "be expected that if a man [or woman] made a false representation or was concealing knowledge of a fact that would materially affect the transaction, he would

7

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

willingly admit that he knew of its falsity all the time." Dyke v. Zaiser, 80 Cal. App. 2d 639, 654 (1947).  Consequently, "proof indicative of fraud may be given by inference, by circumstances surrounding the transaction, and the relationship and interest of the parties." Id.

Here, MBFG has produced a collection of circumstantial evidence which it believes demonstrates that Euler knew of the Nature's Own scheme at the time MBFG was made a beneficiary of the First Policy in July, 2011, or when it renewed the policy in November, 2011. First, MBFG points to an article that Euler Vice President John Steel received in April, 2010, from another finance company which describes a prior criminal fraud perpetrated by Holloway. For this scheme, Holloway apparently utilized a company called International Air Cargo, which company was also listed as a Nature's Own Buyer for the Euler policies.

Second, MBFG cites to a claim by made by yet another finance company, Factor King, on a different Euler policy insuring U.S. Hay Direct. Factor King submitted its claim on the U.S. Hay Direct policy after several of that company's buyers defaulted, which buyers included Nature's Own and several other companies Holloway would later identify as buyers of Nature's Own in the insurance application she submitted to Euler. Factor King subsequently sued Euler with regard to the U.S. Hay Direct policy.

Third, MBFG refers to internal communications between Euler employees between June and October, 2010, suggesting that Euler had doubts about the legitimacy of another of Holloway's businesses. These Euler employees also discussed negative information submitted from another factor concerning a buyer on the U.S. Hay Direct policy. According to an email from Euler Account Manager Janny Fleitas, the factor "had many concerns with the underwriting since some of the addresses [of the buyers] did not match on application and endorsements issued . . . ." Euler Vice President Paul Haigley responded to Fleitas by stating: "If you think there is fraud involved or think the policy should not be in place because it may be 'bad business' then let's think about ending the relationship ASAP." Euler Head of Commercial Underwriting Steven Redmer responded with one word: "Shady!!!"  In another set of emails between Euler Agent Jess

8

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Heidel and Redmer in reference to cancelling other policies involving Holloway, Heidel wrote: "Somehow I don't think we have seen the last of her because her companies [sic] name is changing again and I'm sure she will need to get money from some unlucky factor."

Fourth, MBFG identifies claims made on a policy insuring Equipack, which company was also listed as a buyer on the Nature's Own policy. Several of the defaulting Equipack buyers also simultaneously defaulted on the U.S. Hay Direct policy, including Nature's Own. Annette Zimmerman was listed as the contact person for Nature's Own on the claim form submitted to Euler, and Greg Winters was listed as the contact person for Equipack.

Fifth, MBFG references a telephone call between Euler Assistant General Counsel Deborah Stuehrmann and Florida State Attorney General Phil Hanson that occurred in "late September or early Fall of 2011." Stuehrmann was informed by Hanson that "he was conducting a criminal investigation of US Hay, Kay Holloway, and her boyfriend Greg Winters, possibly regarding [] Factor King."

Although MBFG's evidentiary citations are considerable and interesting, they nonetheless fail to support a reasonable inference that Euler had knowledge of the Nature's Own scheme before it cancelled the credit limits in February, 2012. Nor do they support MBFG's conclusions on close review. Though MBFG seeks to connect the individual known as Marsha Kay Holloway to Nature's Own and the fictitious individual known as Annette Zimmerman, it has produced no evidence to suggest that anyone at Euler knew that Holloway - who inarguably had been implicated in a prior criminal fraud - was also Annette Zimmerman, who Euler only knew as an affiliate of Nature's Own in its dealings with that company as both a buyer on other policies and eventually as an insured on the First and Second Policies. Notably, the conversation between Stuehrmann and Hanson does not make this connection, since Hanson indicated that his investigation involved Holloway and another company, U.S. Hay Direct. Moreover, though Nature's Own was identified as a buyer on the U.S. Hay Direct policy, the apparent business relationship between those two companies is not sufficient to reasonably impart to Euler that

9

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Holloway and Zimmerman were actually the same person. For this reason, MBFG's contention that Euler renewed the First Policy even though it had "information regarding the fraud and the connection between Zimmerman and Holloway" is unsupported by any evidence in the record, circumstantial or otherwise.

Similarly, the article describing Holloway's earlier fraud involving International Air Cargo and Euler's suspicions about Holloway's other businesses do not convincingly connect her to Nature's Own or Zimmerman, even when coupled with the fact that International Air Cargo was later listed as an illusory buyer of Nature's Own. If anything, this evidence shows that Euler may have mistakenly approved credit limits for International Air Cargo in light of the article's revelation. The article does not, however, demonstrate that Euler knew that Nature's Own and its affiliated persona, Zimmerman, were perpetrating a grander fraudulent scheme.

Nor do the claims made on the U.S. Hay Direct and Equipack policies or the Factor King lawsuit sufficiently raise such an inference. The claims and the lawsuit suggest nothing more than the defaults of certain buyers and a subsequent denial of benefits by Euler. Missing from the record is any evidence that fraud was raised in conjunction with the claims at the time they were made or alleged in the Factor King lawsuit. Thus, MBFG's characterization of the Factor King lawsuit as the "Factor King fraud" is merely a conclusion in hindsight without evidentiary support. And though it appears that some Euler employees doubted certain aspects of the information submitted to underwrite the U.S. Hay Direct policy, these doubts about a different company in which Holloway may have been involved do not translate into an inference that Euler later knew of the Nature's Own scheme and its connection to Holloway through Zimmerman.

Even when construed in the manner most favorable to MBFG, none of this evidence either separately or together support MBFG's sweeping contention that Euler somehow knew through a combination of circumstantial references and "the claims in its system" that Nature's Own and its buyers were fraudulent, and that Holloway and Zimmerman were the same person. MBFG has only raised the spectre that Euler was aware of the Nature's Own scheme, but has not produced

10

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

adequate evidence on which the types of fraud requiring knowledge could be proven.

In sum, MBFG has not met its burden to produce evidence on which a reasonable juror could find that Euler knew any of its alleged representations concerning Nature's Own were false or reckless when made, that Euler failed to disclose any similar facts from MBFG, or that Euler had actual knowledge that Nature's Own was engaged in a fraudulent scheme. Accordingly, MBFG cannot prove an element essential to its claims for intentional misrepresentation, fraudulent concealment and aiding and abetting a fraud. Euler is therefore entitled to summary judgment on those claims. Celotex, 477 U.S. at 323 (holding that Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); Nissan Fire & Marine Ins. Co., 210 F.3d at 1103.

### b. Negligent Misrepresentation

Euler challenges the negligent misrepresentation claim on its first element and argues that MBFG cannot support a legally actionable statement with admissible evidence. The record contradicts this argument.

As both parties recognize, negligent misrepresentation "requires a positive assertion." Goonewardene v. ADP, LLC, 5 Cal. App. 5th 154, 175 (2016) (internal quotation marks omitted). "The tort thus encompasses the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true, and the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true." Id. Additionally, "when the defendant purports to convey the 'whole truth' about a subject, 'misleading half-truths' regarding the subject may constitute positive assertions for the purpose of negligent misrepresentation." Id.

MBFG contends that by granting and maintaining credit limits on the Nature's Own buyers, Euler asserted that the buyers were credit worthy despite its knowledge that several buyers

11

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

were under criminal investigation or had previously defaulted on other Euler policies. And MBFG has produced sufficient evidence on which a reasonable juror could find in its favor on that issue. As described above, the evidence shows that several of the same buyers included in the U.S. Hay Direct and Equipack policies were also listed as buyers of Nature's Own in its insurance application. The evidence also shows that overlapping buyers between the three policies defaulted, with some later becoming involved along with Euler in the Factor King lawsuit. In addition, Euler was advised by Attorney General Hanson before it renewed the First Policy in November, 2011, that Holloway, Winters and U.S. Hay Direct were the subjects of a criminal investigation.

Although this same evidence was insufficient to support the other fraud-based claims, here it suffices. A reasonable juror could infer that Euler at least knew the Nature's Own buyers who previously defaulted on the U.S. Hay Direct and Equipack policies were not suitable for coverage, and that, despite this knowledge, Euler approved them under the Nature's Own policy and granted them credit limits.

Euler's opposing argument is unpersuasive. To the extent it avers the coverage grants and credit limit extensions it made to the Nature's Own buyers are not qualifying assertions as a matter of law, the court concludes otherwise because "expressions of professional opinion are treated as representations of fact" under certain circumstances. Pub. Emps.' Ret. Sys. v. Moody's Investors Serv., Inc., 226 Cal. App. 4th 643, 662 (2014). "When a statement, although in the form of an opinion, is not a casual expression of belief but a deliberate affirmation of the matters stated, it may be regarded as a positive assertion of fact." Id. (internal quotation marks and citations omitted). "Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact." Id.

For this case, one need not look further than the Nature's Own Policies for evidence

12

Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

reflecting that Euler granted both coverage and credit limits to the buyers from a position of superior knowledge or with special information. The Policies define a "Buyer" as "a legal entity . . . *approved* for coverage under the Policy." "Credit Limit" is defined as "the maximum amount of coverage [Euler] *will allow* for each Buyer under this Policy." That definition is further refined to state that "[e]ach Buyer has its own Credit Limit which is either *assigned* by [Euler] or qualified by the Insured under the Discretionary Credit Limit." All of these provisions imply that Euler undertakes an investigation of the insured's buyers before approving them for coverage and allowing and assigning credit limits, such that a financing company like Marble Bridge can reasonably rely on the facts that coverage has been approved and credit has been assigned as insinuations of legitimacy.

Because there exists a triable issue of fact, Euler is not entitled to summary judgment on MBFG's negligent misrepresentation claim.

### B. Declaratory Relief, Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

In its fifth claim for declaratory relief, MBFG requests a determination of coverage under the Nature's Own Policies. In its sixth claim for breach of contract, MBFG alleges that Euler breached the Second Policy by failing to pay on MBGF's claims and by failing to provide it with written notice that it cancelled the credit limits for certain Nature's Own buyers. Euler argues it is entitled to summary judgment on both claims. Euler is correct.

#### i. Governing Authority

"In a declaratory relief action to determine the insurer's obligations under the policy, the burden is on the insured initially to prove an event is a claim within the scope of the basic coverage." Merced Mutual Ins. Co. v. Mendez, 213 Cal. App. 3d 41, 47 (1989). To that end, the insured must show that the underlying claim is "of the nature and kind covered by the policy." Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 274 (1966). "The burden then shifts to the insurer to prove the claim falls within an exclusion." Id.

In California, "[t]he standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" Wall St. Network, Ltd. v. New York Times Co., 164 Cal. App. 4th 1171, 1178 (2008) (quoting Regan Roofing Co. v. Super. Ct., 24 Cal. App. 4th 425, 434-35 (1994)).

Like its fraud claims, Euler need only point out a failure of evidence because MBFG would bear the evidentiary burden at trial for declaratory relief and breach of contract. Celotex Corp., 477 U.S. at 325. If it does so, MBFG must sustain the burden of production. Reza, 806 F.3d at 505 (9th Cir. 2015).

### ii. Analysis

The plain language of the Policies' coverage grant was contingent on "Shipments of Covered Products." Pursuant to the definition of that phrase, products had to be delivered from Nature's Own to one of its buyers to trigger coverage. The undisputed evidence shows that no such products were ever delivered from Nature's Own to any of its buyers in a manner satisfying the terms of the policies. MBFG concedes this point, and concedes that "one of its experts opined that there is no coverage under either policy for [MBFG's] claim based on lack of goods, shipments and/or deliveries to the buyers."

As a result, there is no dispute of material fact as to MBFG's claim for declaratory relief; it is not entitled to coverage under either the First or Second Policy. MBFG's legally-unsupported argument that coverage should arise based on Euler's offer to return premium payments to Nature's Own is entirely unpersuasive. As is its equitable estoppel argument given the lack of evidence demonstrating Euler had knowledge of the Nature's Own scheme.

Without coverage, the claims for breach of contract and breach of the covenant of good faith and fair dealing fail as a matter of law. See Schar v. Hartford Life Ins. Co., 242 F. Supp. 2d 708, 720 (N.D. Cal. Jan. 23, 2003). Consequently, Euler is entitled to summary judgment on these claims, as well as the claim for declaratory relief.

### C. UCL

The UCL "prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'" Kwikset Corp. v. Super. Ct., 51 Cal. 4th 310, 320 (2011). As plead in the FAC, MBFG's UCL claim has two aspects. First, it is "tethered" to the conduct underlying the preceding claims. FAC, at ¶ 190. Second, it is based on the allegation that MBFG's "misappropriated funds were funneled to Euler in the form of premiums, fees and other charges paid to Euler by" the perpetrators of the Nature's Own scheme. Id. at ¶ 191.

The fundamental problem with this claim arises from the UCL's restriction on damages. Only injunctive relief and restitution are permissible remedies for UCL violations (Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1146 (2003)), and MBFG is only seeking the latter. FAC, at p. 53:16-17. But MBFG has submitted no evidence of money it paid to Euler that could be ordered returned as restitution. Korea Supply Co., 51 Cal. 4th at 1144-45 (observing that a restitution order under the UCL is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person"). Thus, there is a failure of proof on damages. Euler is entitled to summary judgment on the UCL claim.

### D. RICO

The RICO claims do not require substantive discussion, because they were pled without an appropriate stipulation or leave of court. The court did not permit MBFG to include these claims in the order permitting it to file an amended complaint (Dkt. No. 170), and Federal Rule of Civil Procedure 15 prohibited MBFG from doing so on its own volition. To be sure, once the period for amendment as a matter of course expires, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).

Because they were pled without Euler's consent or leave of court, the RICO claims will be stricken.

15
Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## IV.   ORDER

Based on the foregoing, Euler's Motion for Summary Judgment (Dkt. No. 218) is GRANTED IN PART and DENIED IN PART.

The motion is DENIED as to MBFG's claim for negligent misrepresentation, but is granted in all other aspects.

MBFG's RICO claims are STRICKEN.

MBFG's objections are overruled and its motion to strike is DENIED.  Dkt. Nos. 230, 234.

**IT IS SO ORDERED.**

Dated:  December 2, 2016



EDWARD J. DAVILA
United States District Judge

16
Case No.: 5:12-cv-02729-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT